IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CLESSA HAWKINS, as Special Administrator For TERRY HAWKINS, deceased, and CLESSA HAWKINS, individually,
Plaintiff,

v.

MERCY KANSAS COMMUNITIES, INC., D/B/A MERCY HOSPITAL FORT SCOTT, MARC ENYART, M.D., ROGER PARRIS, M.D., AMY SACHAU, M.D., and SHANNON MEEKS, R.N.,
Defendants.

Case No. 2:14-CV-2405-EFM-KGG

**MEMORANDUM IN SUPPORT OF DEFENDANTS' FIRST MOTION FOR SUMMARY JUDGMENT**

COME NOW Defendants Mercy Kansas Communities, Inc., ("Mercy") and Shannon Meek, R.N., by and through counsel Trevin Wray and Lori Dougherty-Bichsel of Simpson, Logback, Lynch, Norris, P.A., and hereby submit their memorandum in support of their motion for summary judgment, pursuant to D. Kan. 7.1. Defendants seek summary judgment on Plaintiff's EMTALA claims.

## NATURE OF THE CASE

Plaintiff alleges that Defendant Mercy violated the Emergency Medical Treatment and Active Labor Act ("EMTALA") in failing to provide appropriate medical screening to Terry Hawkins on January 5, 7, and 8, 2014, in that Mr. Hawkins was not appropriately diagnosed with pneumonia on each of these occasions. On identical facts, Plaintiff alleges negligence claims against Mercy, Shannon Meek, R.N., Mark Enyart, M.D., Roger Parris, M.D., and Amy Sachau, M.D.

Plaintiff did not disclose a formal Fed. R. Civ. P. 26(a)(2) pleading designating her experts, but did disclose expert reports from five retained medical experts who offer opinions on the care provided to Terry Hawkins. Deposition testimony from those experts, Kenneth Stein, M.D., Joe Haines, M.D., Fred Mushkat, M.D., David Martin, M.D., and Christian Merlo, M.D., will be referred to throughout this motion.

## STATEMENT OF UNCONTROVERTED MATERIAL FACTS

1.  Terry Hawkins came to the Mercy emergency department on January 5, 2014. (Exhibit 1, Mercy medical record, pp 010001, et seq.)

2.  At the January 5, 2014, visit, Terry Hawkins' vital signs were, at a minimum, stable. (Exhibit 2, Deposition of Joe Haines, M.D., 143:17-19; 172:14-22; 174:12-13.)

3.  At the January 5, 2014, visit, Mr. Hawkins' lung sounds were clear, he was not short of breath, and his respirations were normal. (Exhibit 1, Mercy medical record, p. 010003; Exhibit 3, Deposition of Kenneth Stein, M.D., 53:9-12.)

4.  As a result of the January 5, 2014, hospital visit, Mr. Hawkins was diagnosed with sinusitis and was administered antibiotics at the hospital. (Exhibit 1, Mercy medical record, pp. 010006.) Mr. Hawkins was prescribed an antibiotic for at-home use. (Id.)

5.  Mercy provided Mr. Hawkins with treatment for a non-emergent medical condition, on January 5, 2014, because Mercy has agreed to provide care to all patients, regardless of acuity. (Exhibit 4, Deposition of David Phelps, 11:20-12:17.)

6.    On January 7, 2014, Plaintiff alleges that Mr. Hawkins returned to the emergency department seeking treatment, but was turned away. (Doc. 67, para. 20-22.) Defendant denies this allegation, but concedes the same must be considered as true for purposes of this motion.

7.    On January 8, 2014, Mr. Hawkins was seen by a primary care physician, despite not having an appointment. (Exhibit 5, Deposition of Clessa Hawkins, 129:6-10; 130: 3-13.) An influenza test run as a result of that encounter was negative. (Exhibit 1, Mercy medical record, pp. 0100086.) Mr. Hawkins' treatment plan was changed, and he was prescribed a different antibiotic for at-home use. (Id.)

8.    At or around the time of Mr. Hawkins' encounter with the primary care physician on January 8, 2014, he was joking with a friend in the waiting room. (Exhibit 6, Deposition of Vickie Crowe, 47:5-48:9.)

9.    The encounter Mr. Hawkins initiated on January 8, 2014, was with the Mercy Physician's Clinic. (Exhibit 5, Deposition of Clessa Hawkins, 130:25-131:15. It operates under a separate Medicare billing number, and does not have a dedicated emergency department. (Exhibit 7, Affidavit of Christina Keating).

10.   At approximately 1858 on January 8, 2014, Mr. Hawkins' family delivered him to Via Christi Hospital in Pittsburg, KS. Upon arrival, Mr. Hawkins' vital signs were normal. (Exhibit 2, Deposition of Joe Haines, M.D., 146:1-147:6.)

11.   Because Mr. Hawkins' vital signs were normal on January 8, 2014, at least one of Plaintiff's experts concedes that it is reasonable to conclude his vital signs were probably normal on January 7, 2014. (Exhibit 2, Deposition of Joe Haines, M.D., 144:9 – 145:25.)

12.   Mr. Hawkins became unstable at home on January 8, 2014, with a more rapid downward decline while in the emergency department at Via Christi Hospital in Pittsburg.  (Exhibit 2, Deposition of Joe Haines, M.D., 147:24-148:7; Exhibit 8, Deposition of David Martin, M.D., 66:3-7.)

13.   The reason for admitting Mr. Hawkins to Via Christi Hospital was "due to failure of outpatient therapy on two medications."  (Exhibit 9, Via Christi-Pittsburg medical record, p. 020017.)  Plaintiff's retained infectious diseases expert witness agrees with this assessment as a valid reason to admit Mr. Hawkins at that time. (Exhibit 8, Deposition of David Martin, M.D., 66:11-25.)

14.   Plaintiff's retained infectious diseases expert testified that there was no bacterial component to Mr. Hawkins' illness, and that, in retrospect, he had Influenza A pneumonia ultimately complicated by advanced respiratory distress disorder. (Exhibit 8, Deposition of David Martin, M.D., 30:9-25.)

15.   Mr. Hawkins was an unusual patient, who did not present in the manner typical of influenza patients.  (Exhibit 8, Deposition of David Martin, M.D., 43:22-44:4.)

16.   Because Mr. Hawkins had a viral illness, Plaintiff's retained infectious diseases expert testified that the appropriate treatment was with Tamiflu, and a hospital admission "to make sure he was getting the drug."  (Exhibit 8, Deposition of David Martin, M.D., 51:10-15.)  The other standard treatments, while indicated, we know in retrospect would not have been effective.  (Id at 32:21-33:24.)

17.   Plaintiff's retained expert witnesses do not agree on the type of pneumonia Terry Hawkins presented with.

    a.   Dr. Fred Mushkat testified that beginning on or before January 5, 2014, Mr. Hawkins could have had viral pneumonia or bacterial pneumonia, or both, but that he could not be sure of which type.  (Exhibit 10, Deposition of Fred Mushkat, M.D., 150:4-151:7.)

    b.   Dr. David Martin, Plaintiff's expert on infectious diseases, testified that there is a "high probability" that Mr. Hawkins had a viral pneumonia with no bacterial component.  (Exhibit 8, Deposition of David Martin, M.D., 45:16-19; 30:9-25.)

    c.   Dr. Joe Haines testified that Mr. Hawkins had viral pneumonia initially, but that it moved into a bacterial pneumonia later.  (Exhibit 2, Deposition of Joe Haines, M.D., 114:19-23.)

    d.   Dr. Kenneth Stein testified that Mr. Hawkins likely had viral pneumonia, but "wonder[ed]" if there was a complicated bacterial infection on top of it." (Exhibit 3, Deposition of Kenneth Stein, M.D., 97:16-98:5.)

    e.   Dr. Christian Merlo testified that it is his belief that Mr. Hawkins had bacterial pneumonia with no viral processes.  (Exhibit 11, Deposition of Christian Merlo, 100:2-103:15.)

18.    Plaintiff's expert witnesses do not agree on the type of care that could have been effective, nor which treatment was required.  There is particular disagreement on whether a particular anti-viral, Tamiflu, should have been administered.

    a.   Dr. David Martin contends that Mr. Hawkins should have received Tamaflu for the treatment of influenza, although he concedes there is no data to support its effectiveness in a patient like this. (Exhibit 8, Deposition of David Martin,

M.D., p. 37:14-38:14.)  Regardless, he criticizes the Defendants for failing to institute that care.

b.  Dr. Joe Haines testified that he would not give this patient Tamaflu, because of the length of illness.  (Exhibit 2, Deposition of Joe Haines, M.D., 81:19-82:5.)   Dr. Haines conceded that he may have previously testified that administering Tamaflu after 48 hours is itself a violation of the standard of care.  (Id. at 85:17-86:1.)

c.  Dr. Kenneth Stein testified that it is common to start Tamiflu after 48 hours if the illness involves severe pneumonia and the patient will be hospitalized. (Exhibit 3, Deposition of Kenneth Stein, M.D., 54:2-55:8.)

d.  Dr. Fred Mushkat testified that he would not give Tamiflu to a patient who had influenza longer than 48 hours.  (Exhibit 10, Deposition of Fred Mushkat, M.D., 104:7-21.)

e.  Dr. Christian Merlo testified that he does not even believe Mr. Hawkins ever had pneumonia on January 5, 2014 and does not believe it was viral.  (Exhibit 11, Deposition of Christian Merlo, 188:17-189:18.)   He does not believe Tamiflu would have affected Mr. Hawkins' outcome.  (Id at 219:3-15.)

19.  Plaintiff's experts concede that a reasonable and prudent medical provider could look to pneumonia severity scoring indexes to determine whether a pneumonia patient needs to be admitted to the hospital.  (Exhibit 2, Deposition of Joe Haines, M.D., 141:24-142:8; Exhibit 10, Deposition of Fred Mushkat, M.D., 157:11-159:17.)

20.     Assuming Mr. Hawkins had pneumonia from the outset, the pneumonia severity scoring indexes place Mr. Hawkins' condition at each of his Mercy visits as requiring only outpatient therapy.   (Exhibit 10, Deposition of Fred Mushkat, M.D., 161:6-25; Exhibit 2, Deposition of Joe Haines, M.D., 141:24-143:2.)   At no point until the early morning hours of January 9, 2015, was Mr. Hawkins a person who required hospital admission using these scoring indexes.

## ISSUES PRESENTED

**I.      Can Plaintiff make a submissible claim for an EMTALA violation based upon the January 5, 2014 visit, when Terry Hawkins received both an examination and treatment, where no unstable emergency medical condition existed, and where Plaintiff makes no claim of disparate treatment in relation to patients with the same or similar medical conditions?**

**II.     Can Plaintiff make a submissible claim for an EMTALA violation pertaining to the January 7, 2014, encounter, where there is no evidence that he suffered from an emergency medical condition on that date?**

**III.    Can Plaintiff make a submissible EMTALA claim based upon Mr. Hawkins' January 8, 2014 visit to a Mercy outpatient physician clinic when he did not come to the Emergency Department?**

## STANDARD FOR SUMMARY JUDGMENT

A moving party is entitled to summary judgment pursuant to Fed. R. Civ. P. 56 if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242,

247, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986). Once the movant has met this burden, the non-moving party may not rest on the allegations in its pleadings but, by affidavit and other evidence, must set forth specific facts showing that a genuine issue of material fact exists. Fed. R. Civ. P. 56(e). In doing so, the non-moving party bears the burden of setting forth specific facts showing that there is sufficient evidence in its favor to allow a jury to return a verdict for it. *Anderson*, 477 U.S. at 249.

**ARGUMENTS AND AUTHORITY**

**I. Plaintiff has procured no evidence that on January 5, 2014, Terry Hawkins was given a medical screening examination that differed substantially from other similarly situated patients, and has provided no evidence that Terry Hawkins had an unstable emergency medical condition. Therefore, Plaintiff fails to state an EMTALA claim as to the January 5, 2014, emergency department visit as a matter of law.**

**A. Terry Hawkins received a medical screening examination and treatment of a non-emergent medical condition.**

EMTALA was enacted to prevent hospitals from "dumping" patients that they could treat but who could not pay for services. *Ingram v. Muskogee Reg'l Med. Ctr.*, 235 F.3d 550, 551 (10th Cir. 2000). "42 U.S.C. 1395dd(a) is not intended to ensure each emergency room patient a correct diagnosis, but rather to ensure that each is accorded the same level of treatment regularly provided to patients in similar medical circumstances." *Collins v. DePaul Hosp.*, 963 F.2d 303, 307 (10th Cir. 1992) (internal citations omitted). EMTALA is not a federal malpractice or negligence statute. *Scott v. Hutchinson Hosp.*, 959 F. Supp. 1351, 1357 (D. Kan. 1997).

EMTALA contains two primary requirements. First, a participating hospital must "provide for an appropriate screening... to determine whether or not an emergency medical

condition...exists." 42 U.S.C. § 1395dd(a).  Second, if an individual has an emergency medical condition, the hospital must provide "such treatment as may be required to stabilize the medical condition." 42 U.S.C. § 1395dd(b)(1)(A).  In stating a cause of action alleging a violation of one or both of these conditions, a plaintiff must establish:  1) he/she went to the defendant's emergency room; 2) with an emergency medical condition, and the defendant's hospital either 3) did not adequately screen him/her to determine whether an emergency medical condition exists, or 4) discharged him/her before the emergency medical condition was stabilized.  *Miller v. Med. Ctr. of SW Louisiana*, 22 F.3d 626, n. 8 (5th Cir. 1994).

A hospital satisfies the requirements of § 1395dd(a) if its standard screening procedure is applied uniformly to all patients in similar medical circumstances.  *Phillips v. Hillcrest Med. Ctr.*, 244 F.3d 790, 797 (10th Cir. 2001) (citing *Tank v. Chronister*, 941 F.Supp. 969, 972 (D. Kan. 1996).  EMTALA is implicated only when individuals who are perceived to have the same medical condition receive disparate treatment . . . . Id. citing *Vickers vs. Nash Gen. Hosp.*,78 F.3d 139, 144 (4th Cir. 1996).  Disparate treatment is simply another term for describing or measuring a hospital's duty to abide by its established procedures.  *Phillips* 244 F. 3d at 797.

In her *Third Amended Complaint*, Plaintiff alleges that Mercy Hospital violated EMTALA when it failed to screen Terry Hawkins for pneumonia when he presented to the Mercy Hospital ED on January 5, 2014.  This claim should be dismissed, as a matter of law, because Terry Hawkins was provided "an appropriate screening" as provided "uniformly" to <u>all</u> patients in the Mercy ER.  Indeed, Mr. Hawkins was screened and evaluated by Dr. Enyart, a Mercy ER physician, on January 5th.  After he gave Mr. Hawkins a full medical workup in the ER, Dr. Enyart determined that the patient was not suffering from an "emergency medical condition."  Dr. Enyart treated Mr. Hawkins presumptively with an antibiotic and released him

from treatment in the ER. With this medical course, Mercy greatly exceeded its obligations under EMTALA, which in no way required it to treat a non-emergent medical condition.

**1. Plaintiff has not alleged, nor has she provided any facts showing that the treatment provided by Mercy Hospital to Mr. Hawkins was in any way "disparate" or substantively different that other Mercy patients with similar symptoms.**

Plaintiff's allegation as to the January 5th encounter is confined to an allegation that Mercy failed to provide Mr. Hawkins with blood work and a chest x-ray on January 5, 2014. Not only has Plaintiff failed to procure evidence demonstrating substantially different treatment is usually given to other patients under the same or similar circumstances, all of the evidence in the case is contrary to the contention that Mr. Hawkins was somehow treated differently simply because he had no insurance. Perhaps recognizing that fact, she has designated an expert witness whose objective appears to be obfuscation of this issue.

> Q I'm trying to ask you this. Was it your conclusion that there was no correlation between whether a patient had insurance, as to whether they got an x-ray?
> A The issue I'm testifying, is whether or not this patient who didn't have insurance didn't get an x-ray. Not whether or not there is a grand plan and a scheme at Mercy Fort Scott Hospital to deprive the uninsured of medical care.
> (Deposition of Richard Ludgin, M.D./J.D., 43:25 – 44:8.)
> Q So if I understood your prior testimony correctly, you made a determination here, in your opinion, about whether EMTALA was violated on January 5th regarding the sufficiency of Mr. Hawkins' specific screening examination versus, in the broader context, whether that was similar to that which other patients get or whether there was any difference between insured patients and uninsured patients, true?
> A Yeah, that's correct.
> (Exhibit 12, Deposition of Richard Ludgin, M.D./J.D., 45:9-18.)

This is a classic miscast of a medical malpractice claim as an EMTALA violation, and must be dismissed as a matter of law. Plaintiff has not even made an effort to determine whether the medical screening process was applied evenly, instead attempting to "double-dip" EMTALA and malpractice claims on identical allegations of fact. In *Phillips v. Hillcrest Med. Ctr.*, the 10th Circuit Court of Appeals directly addressed EMTALA violation allegations analogous to Plaintiff's:

> Appellants' argument brings into focus the uneasy intersection between EMTALA and state law medical negligence claims. They argue HMC staff failed to appropriately identify and/or appreciate the gravity of [Plaintiff's] condition. In other words, while they concede [Defendant] technically complied with their pre-existing standards, the practical effect was an inadequate examination. EMTALA was not, however, designed for such a claim. Though it created a new cause of action, we have consistently recognized EMTALA's provisions have only a limited reach and purpose. . . . EMTALA does not set a federal standard of care or replace pre-existing state medical negligence laws. . . . While providing a guaranty for an "appropriate medical screening," EMTALA, unlike traditional state negligence or malpractice law, does not provide a remedy for an inadequate or inaccurate diagnosis. 244 F.3d at 798. (internal citations omitted)

Plaintiff's contentions of misdiagnosis and mistreatment fall into a class of claims that the *Phillips* Court warned are inappropriate for submission on an EMTALA theory. "[I]nserting into EMTALA an action for violation of standard medical procedures for patients admitted and treated for several hours would convert the statute into a federal malpractice statute, something it was never intended to be." *Tank v. Chronister*, 941 F.Supp. 969, 972 (D. Kan. 1996) (internal citations omitted.)

As she has procured no evidence of disparate treatment as compared to other emergency patients, Plaintiff's EMTALA claim as to the January 5, 2014, visit must be dismissed as a matter of law.

**2. Terry Hawkins did not have an Emergency Medical Condition on January 5, 2014, as that term is defined by EMTALA.**

Even assuming *arguendo* that Mr. Hawkins was indeed suffering from pneumonia on the January 5th visit, a matter Plaintiff's own experts are unsure of, Plaintiff's EMTALA claim fails as a matter of law because he was not suffering from an unstable emergency medical condition. Failure to diagnose, as explained by the courts it the above-cited cases, is not a legal basis for an EMTALA violation. Under EMTALA, an "emergency medical condition" is one "manifesting itself by acute symptoms of sufficient severity (including severe pain) such that the absence of immediate medical attention could reasonably be expected to result in-(i) the placing of the health of the individual . . . in serious jeopardy, (ii) serious impairment to bodily functions, or (iii) serious dysfunction of any bodily organ or part. . . ." 42 U.S.C. § 1395dd(b)(1)(A). Put simply, even if Mercy had done the medical screening Plaintiff now demands, it would not have uncovered an emergency medical condition, which is required to trigger the duty to treat to stability. *Urban v. King*, 43 F.3d 523, 526 (10th Cir. 1994) (hospital cannot be held to stabilize an emergency situation without knowing an emergency exists).

Despite the benefit of hindsight, Plaintiff's retained expert witnesses cannot even agree on what type of pneumonia Mr. Hawkins had, which necessarily affects the type of treatment that should have been prescribed. Worse yet, they cannot agree on what treatment would have potentially prevented Mr. Hawkins' demise. If Plaintiff's own retained experts cannot agree on Mr. Hawkins' condition or the proper treatment, it should suggest, at a minimum, that Mr. Hawkins' medical condition did not manifest itself in "acute symptoms of sufficient severity" between January 5- 8, 2014, to suggest that he had an emergency medical condition.

In contrast, Plaintiff's experts largely agree that there are widely accepted pneumonia severity scoring indexes, which a reasonable provider could use as a guide to determining whether to treat a pneumonia patient as an outpatient or an inpatient.[1]  These guidelines would have scored Terry Hawkins as an outpatient observation patient in every circumstance.  By definition, a condition that does not require admission for further treatment could not be considered an emergency medical condition under EMTALA.

Whether the standard of care should move a reasonable and prudent medical practitioner to disregard the guidelines and move to a different form of treatment is a matter of dispute.  But no reasonable juror could conclude on this evidence that Mr. Hawkins, who would have been perceived as having a .04% chance of mortality under the guidelines, and whose condition and appropriate treatment cannot even be agreed upon in hindsight, could have been perceived as having a condition that, left untreated, could be *reasonably* expected to result in serious bodily harm. Plaintiff's EMTALA claim as to the January 5, 2014, encounter should be dismissed as a matter of law, as she has failed to procure sufficient evidence to demonstrate the existence of an emergency medical condition.

### 3.   Terry Hawkins was not unstable.

If an emergency medical condition is detected, the treatment that hospitals must provide under the Act refers only to "such medical treatment of the condition as may be necessary to assure, within reasonable medical probability, that no material deterioration of the condition is likely to result from or occur during the transfer of the individual from a facility." 42 U.S.C. § 1395dd(e)(3)(A). EMTALA's definition of "stability" does not share the same meaning as the medical term "stable condition," which "indicates that a patient's disease process has not changed

---

[1] See, e.g., Exhibit 7, Deposition of David Martin, M.D., 44:4-16; Exhibit 8, Deposition of Fred Mushkat, M.D., 160:1-24; Exhibit 2, Deposition of Joe Haines, M.D., 142:13-143:2;

precipitously or significantly," Tabor's Cyclopedic Medical Dictionary 1861 (Clayton L. Thomas ed., 17th ed. 1993); see also Mosby's Medical, Nursing, & Allied Health Dictionary 1474 (Kenneth N. Anderson et al. eds., 4th ed. 1994) (defining "stable condition" as "a state of health in which the prognosis indicates little if any immediate change"). Under EMTALA, "[a] patient may be in a critical condition . . . and still be 'stabilized' under the terms of the Act." *Brooker v. Desert Hosp. Corp.*, 947 F.2d 412, 415 (9th Cir. 1991).

Assuming that on January 5th Mr. Hawkins had been suffering from an "emergency medical condition" sufficient to trigger the applicable stabilizing treatment under EMTALA, a claim which is both unsupported by the record and denied by the defendants, Plaintiff still cannot successfully carry a claim for an EMTALA violation against Mercy on January 5, 2014, because she presents no evidence that Mr. Hawkins was "unstable." EMTALA mandates that hospitals provide treatment to stabilize patients suffering from emergency medical conditions. A patient who is stable, by definition, requires no stabilizing treatment.

EMTALA does not mandate that hospitals treat all patients that come to the ED, and as Mercy treats all patients regardless of emergency status, it exceeds EMTALA's requirements. EMTALA does not, however, act as a guarantor of a good medical outcome for all patients. *Cleland v. Bronson Health Care Group, Inc.*, 917 F.2d 266, 271 (6th Cir. 1990) (stating that "neither the normal meaning of stabilization, nor any of the attendant legislative history or apparatus, indicates that Congress intended to provide a guarantee of the result of emergency room treatment and discharge.") EMTALA requires that participating hospitals provide *stabilizing treatment* to patients with *emergency medical conditions*. In this case, Plaintiff's experts' allegations deal with the allegedly curative treatment they believe should have been provided to Terry Hawkins, not treatment designed to stabilize an emergency condition. While

there is vigorous debate as to whether effective treatment could have been provided to Mr. Hawkins at all, particularly if he had a viral illness, no reasonable juror could conclude that Mr. Hawkins was in an unstable emergent condition. Without evidence that would permit this conclusion, the EMTALA claim fails.

**II. Plaintiff's January 7, 2014, EMTALA claim should be dismissed as a matter of law, as no reasonable juror could conclude the presence of an "emergency medical condition" as that phrase is defined by EMTALA.**

Defendants concede that there are disputed issues of fact as to what occurred during the January 7, 2014, encounter between Shannon Meek and Terry Hawkins. However, even if we assume that Plaintiff's allegations of fact are the correct version of events, her claim still fails as a matter of law, as she has not established that Mr. Hawkins had an "emergency medical condition," as that phrase is defined by EMTALA, when he arrived on January 7, 2014.

As discussed above, EMTALA defines an "emergency medical condition" as a condition creating "acute symptoms of sufficient severity…such that the absence of *immediate* medical attention could reasonably be expected to result in" serious harm. 42 U.S.C. § 1395dd(e)(1)(A), emphasis added. The avowed purpose of EMTALA was not to guarantee that all patients are properly diagnosed, or even to ensure that they receive adequate care, but instead to provide an "adequate first response to a medical crisis" for all patients and "send a clear signal to the hospital community . . . that all Americans, regardless of wealth or status, should know that a hospital will provide what services it can when they are *truly in physical distress*." 131 Cong. Rec. S13904 (Oct, 23, 1985) (statement of Sen. Durenberger, emphasis added).

Plaintiff's case appears to use the EMTALA phrase emergency medical condition as though simply interchangeable with any medical condition that needs treatment. While it is

strange that her own experts cannot agree on what the condition was or what treatment was necessary, they do appear to agree that Mr. Hawkins was not in extremis. The uncontroverted facts establish that Mr. Hawkins was certainly stable on January 7, 2014, as he had stable vital signs upon arrival at Via Christi the following day. At Mercy on January 7, 2014, he had a conversation with the nurse about his medications, and elected to leave and follow up with a primary care physician the following day. When he did so, he was observed as joking around in the waiting room. On these facts, no reasonable juror could conclude that Mr. Hawkins was manifesting symptoms of sufficient severity as to constitute a medical emergency under EMTALA. Plaintiff's claim on January 7, 2015, is one for medical malpractice, not an EMTALA violation, and the EMTALA claim should be dismissed as a matter of law.

**III. Plaintiff cannot sustain a claim for an EMTALA violation based on the January 8, 2014 visit because the patient did not "come to the emergency department" as required to state an EMTALA claim.**

EMTALA requirements are only triggered when an individual "comes to the emergency department." 42 C.F.R. § 489.24(a)(1). "Comes to the emergency department" means the individual who is not already a patient of the hospital, "has presented at a hospital's dedicated emergency department" or has "presented on hospital property." 42 C.F.R. § 489.24(b). "Dedicated emergency department" means any department or facility of the hospital that is licensed by the State as an emergency room or emergency department or that is held out to the public (by name, signs, or advertising) as a place that provides care for emergency medical conditions on an urgent basis. 42 C.F.R. § 489.24(b). The Center for Medicare and Medicaid Services (CMS) further distinguished the meaning of "patient" in 2003 as it applies to EMTALA (68 F.R. 53,222 at 53,238-40, September 9, 2003). In the *Federal Register* article

clarifying the rule, the agency stated that EMTALA *does not* apply to outpatients of a hospital (even if during an outpatient encounter they are later found to have an emergency medical condition) because outpatients, or those considered as patients of the hospital (not the ED), are protected by Medicare's Conditions of Participation and relevant State law, therefore EMTALA is not triggered under circumstances where an individual has begun to receive outpatient services at an encounter at the hospital. Such patients—those who are treated at the hospital but not in the ED or a legal equivalent—are not considered to have "come to the hospital" for the purposes of EMTALA. Id. See also *Torretti v. Main Line Hospitals, Inc.*, 580 F.3d 168, 176 (3d Cir.) amended, 586 F.3d 1011 (3d Cir. 2009).

In the case at hand, Mr. Hawkins did not "come to the emergency department" at Mercy Hospital on January 8, 2014. He presented at an outpatient physician clinic (Mercy Physicians Group) at the hospital. Hospital property, as defined by EMTALA regulations, means the entire main hospital campus but "excluding other areas or structures of the hospital's main building that are not part of the hospital, such as physician offices... or other entities that participate separately under Medicare...." 42 C.F.R. § 489.24(b). The Mercy Physicians Group clinic that Mr. Hawkins visited as an outpatient on January 8, 2014 is an entity separate from the main hospital—it "participate[s] separately under Medicare" and operates under a different cost center from the hospital. The clinic does not meet the statutory definition of either "dedicated emergency department" or other "hospital property" so as to trigger the availability of an EMTALA claim for Mr. Hawkins based on his January 8, 2014 visit. Further, the aforementioned rationale advanced by CMS and cited by federal courts that have interpreted this issue implicitly applies here. EMTALA is not intended to apply to outpatients who do not come to the emergency department. Congress passed EMTALA to curb the problem of patient

dumping by creating a statutory duty for hospitals to examine individuals who come to them for emergency care. *Torretti* 580 F.3d at 177. Its application was not intended for circumstances outside of such a scenario. Outpatients of a hospital are not, as the CMS clarification in *Torretti* points out, without protection. Those protections, however, fall outside the scope of EMTALA. Therefore, EMTALA does not apply to Mr. Hawkins' visit to the Mercy Physicians clinic and Plaintiff cannot sustain her claim for EMTALA violations. Defendants are entitled to summary judgment and Plaintiff's January 8th EMTALA claim should therefore be dismissed as a matter of law.

## CONCLUSION

Plaintiff has failed to put forth a legally submissible claim under EMTALA for the Mercy Hospital visits made by Mr. Hawkins on January 5th, January 7th, or January 8, 2014. As such, for the reasons and arguments asserted herein, Defendant is entitled to summary judgment on these claims as a matter of law.

**WHEREFORE**, because Plaintiff fails to meet her burden as a matter of law, Defendant respectfully requests that this Court grant this motion for summary judgment, dismiss those claims with prejudice, and award Defendant all of its appropriate costs and expenses incurred in the litigation.

Respectfully Submitted,

SIMPSON, LOGBACK, LYNCH, NORRIS, P.A.

By: */s/ Trevin E. Wray*
Trevin E. Wray, KS #21165
Lori D. Dougherty-Bichsel, KS #22696
7400 W. 110th Street, Suite 600
Overland Park, Kansas 66210
913-342-2500
913-342-0603 – facsimile
E-Mail: twray@slln.com
E-Mail: ldougherty@slln.com
Attorneys for Defendant Mercy Kansas Communities, Inc. and Shannon Meek

**CERTIFICATE OF SERVICE**

It is hereby certified that a true and correct copy of the above and foregoing was deposited in the United States mail, first class postage, prepaid, on this 4th day of November, 2015, to:

Roger Johnson
Scott Vorhees
Johnson, Vorhees & Martuci
510 W. 6th Street
Joplin, MO 64801
E-mail: roger@4stateslaw.com
E-mail: scott@4stateslaw.com
ATTORNEYS FOR PLAINTIFF

Leigh C. Hudson
Hudson & Mullies, L.L.C.
710 West 8th Street, Suite 203
PO Box 866
Fort Scott, KS 66701
E-mail: leigh@hudsonmullies.com
ATTORNEYS FOR DEFENDANT DOCTORS

*/s/ Trevin E. Wray*
Trevin E. Wray

010001

MERCY HOSPITAL FORT SCOTT
401 Woodland Hills Blvd
Fort Scott, KS 66701-8797

HAWKINS,TERRY WAYNE
MRN: E1502158003
DOB: ex: M
Adm:1/5/2014, D/C:1/5/2014

## ER Records

### ED Arrival Information

| Expected | Arrival | Acuity | Means of Arrival | Escorted By | Service | Admission Type | Arrival Complaint |
|---|---|---|---|---|---|---|---|
| - | 1/5/2014 17:41 | ESI 5 | Car | Self | ED | Urgent | FEVER, CONGESTION |

### ED Final Diagnosis

| Diagnosis | Comment | Added By | Time Added | Team Role | Provider Specialty |
|---|---|---|---|---|---|
| Sinusitis | | Enyart, Marc Edward, MD | 1/5/2014 5:49 PM | Attending Provider | Family Practice, Emergency Medicine |
| Fever | | Enyart, Marc Edward, MD | 1/5/2014 5:49 PM | Attending Provider | Family Practice, Emergency Medicine |
| Cough | | Enyart, Marc Edward, MD | 1/5/2014 5:49 PM | Attending Provider | Family Practice, Emergency Medicine |

### ED Disposition

| Disposition | Comments |
|---|---|
| Discharge | None |

### Chief Complaint

| User | Date & Time |
|---|---|
| **Fry, Dennis L., RN** | **1/5/2014 5:47 PM** |

Chief Complaint
Cough
Comment : Pt has come to ER with cc of cough, congestion, sinuis pain and pressure, intermittant fever for the last 11 days. PT has not seen his doctor an came to ER for evaluation.

| User | Date & Time |
|---|---|
| **Fry, Dennis L., RN** | **1/5/2014 5:44 PM** |

Chief Complaint
Cough

### Follow-up Information

| Follow-up With | Details | Comments | Contact Info |
|---|---|---|---|
| Sachau, Amy, MD | | or primary doctor of your choice if not improving | 403 Woodland Hills Blvd. Fort Scott KS 66701 620-223-8040 |

### Current Discharge Medication List

Medication list as of 1/5/2014 5:52 PM
START taking these medications

| Medication | AM | Noon | PM | Bedtime |
|---|---|---|---|---|
| **amoxicillin (AMOXIL) 500 mg capsule**<br>Take 1 Cap by mouth 3 times daily for 10 days.<br>Disp-30 Cap, R-0 | [ ] | [ ] | [ ] | [ ] |

EXHIBIT
1

010003

MERCY HOSPITAL FORT SCOTT
401 Woodland Hills Blvd
Fort Scott, KS 66701-8797

HAWKINS,TERRY WAYNE
MRN: E1502158003
DOB: [redacted], Sex: M
Adm:1/5/2014, D/C:1/5/2014

**ER Records (continued)**

Pleasanton Family Practice 1-913-352-8379

**ED Provider Notes**

ED Provider Notes signed by Enyart, Marc Edward, MD at 1/5/2014 5:56 PM

| Author | Enyart, Marc Edward, MD | Service | (none) | Author Type: | Physician |
|---|---|---|---|---|---|
| Filed | 1/5/2014 5:56 PM | Note Time | 1/5/2014 5:52 PM | | |

**HISTORY OF PRESENT ILLNESS**

Terry Wayne Hawkins, a 56 y.o. male presents to the ED with a Chief Complaint of Cough

**HPI Comments:** He has been around sick family members. He has been running fever and coughing for over 11 days and is not getting better.

The history is provided by the patient and the spouse. The patient arrived by private vehicle. The patient arrived from home.

**Cough**

This is a new problem. The current episode started more than 1 week ago. The problem occurs constantly. The problem has been gradually worsening. The cough is productive of sputum. The maximum temperature recorded prior to his arrival was 102 to 102.9 F. Associated symptoms include chest pain (with coughing), chills, headaches, rhinorrhea, sore throat and myalgias. Pertinent negatives include no sweats, no weight loss, no ear congestion, no ear pain, no shortness of breath, no wheezing and no eye redness. He has tried nothing for the symptoms. He is not a smoker.

**REVIEW OF SYSTEMS**

Review of Systems
Constitutional: Positive for fever and chills. Negative for weight loss.
HENT: Positive for congestion, sore throat, rhinorrhea, postnasal drip and sinus pressure. Negative for ear pain, neck pain and neck stiffness.
Eyes: Negative for redness.
Respiratory: Positive for cough. Negative for shortness of breath and wheezing.
Cardiovascular: Positive for chest pain (with coughing).
Gastrointestinal: Negative for abdominal pain.
Musculoskeletal: Positive for myalgias.
Skin: Negative for rash.
Neurological: Positive for headaches.

**PAST MEDICAL HISTORY REVIEWED**

**MEDICAL**

Patient has a past medical history of Patient denies relevant medical history and Lip laceration (05/12/2010).

**SURGICAL**

Patient has no past surgical history on file.

**FAMILY**

FTSC MEDICAL RECORDS
401 Woodland Hills Blvd

HAWKINS,TERRY WAYNE
MRN: E1502158003

Printed by 8863 at 9/12/14 9:01 AM

010006

MERCY HOSPITAL FORT SCOTT
401 Woodland Hills Blvd
Fort Scott, KS 66701-8797

HAWKINS,TERRY WAYNE
MRN: E1502158003
DOB: , Sex: M
Adm:1/5/2014, D/C 1/5/2014

ER Records (continued)

ED Provider Notes (continued)

**CLINICAL IMPRESSION**

Final diagnoses:
Sinusitis
Fever
Cough

**CODING**

MDM Coding
Reviewed: vitals, nursing note and previous chart
Interpretation: SP02

**DISPOSITION, EDUCATION AND MEDICATION RECONCILIATION**

Medications reconciled. See after visit summary for patient education on discharged patients

ED Orders

| Start | | Status | Ordering Provider |
|---|---|---|---|
| 01/05/14 1800 | **dexamethasone (DECADRON) injection 10 mg** [65415926] ONE TIME ONLY | Last MAR action Given - by FRY, DENNIS L. on 01/05/14 at 1755 | ENYART, MARC EDWARD |
| 01/05/14 1800 | **methylPREDNISolone Acetate (DEPO-MEDROL) injection 80 mg** [65415927] ONE TIME ONLY | Last MAR action Given - by FRY, DENNIS L. on 01/05/14 at 1755 | ENYART, MARC EDWARD |
| 01/05/14 1800 | **cefTRIAXone (ROCEPHIN) vial 1,000 mg** [65415928] ONE TIME ONLY | Last MAR action Given - by FRY, DENNIS L. on 01/05/14 at 1754 | ENYART, MARC EDWARD |
| 01/05/14 1800 | **lidocaine 1 % (XYLOCAINE) injection 2.1 mL** [65415929] ONE TIME ONLY | Last MAR action Given - by FRY, DENNIS L. on 01/05/14 at 1754 | ENYART, MARC EDWARD |
| 01/05/14 1755 | **DISCHARGE PATIENT** [65415932] ONE TIME, Status: Canceled | Canceled | ENYART, MARC EDWARD |

FTSC MEDICAL RECORDS
401 Woodland Hills Blvd

HAWKINS,TERRY WAYNE
MRN: E1502158003

Printed by 8863 at 9/12/14 9:01 AM

010086

MERCY HOSPITAL FORT SCOTT
401 Woodland Hills Blvd
Fort Scott, KS 66701-8797

HAWKINS,TERRY WAYNE
MRN: E1502158003
DOB: ', Sex: M
Adm:1/8/2014, D/C:1/8/2014

**Lab Orders and Results (01/08/14 - 01/08/14) (continued)**

**INFLUENZA VIRUS A AND B ANTIGEN [111063780] (continued)** Completed

Electronically signed by: Sachau, Amy, MD 01/08/14 1407

Lab status: Final result

Specimen: Respiratory specimen; Nasopharyngeal 01/08/14 1415

Instance released by: Park, Rachel V. 1/8/2014 2:15 PM

Diagnoses: Fever [780.60]

Final result, Resulted on: 01/08/14 1436 (Normal)

Order Status: Completed

Resulting Lab: MERCY LABORATORY SERVICES - FORT SCOTT

Collected by: PARK, RACHEL V.

Specimen: [14FT-008M0014] Respiratory specimen; Nasopharyngeal 01/08/14 1415

| Component | Value | Ref Range | Flag | Comment | Lab |
|---|---|---|---|---|---|
| INFLUENZA A AG | Not Detected | Not Detected | | - | FTSC LAB |
| INFLUENZA B AG | Not Detected | Not Detected | | - | FTSC LAB |

**Testing Performed By**

| Lab - Abbreviation | Name | Director | Address | Valid Date Range |
|---|---|---|---|---|
| 9 - FTSC LAB | MERCY LABORATORY SERVICES - FORT SCOTT | Steven V. Wellert, MD | CLIA# 17D0689019 401 WOODLAND HILLS BLVD FORT SCOTT KS 66701 | 06/06/13 1532 - Present |

**End of Encounter**

**END OF REPORT**

FTSC MEDICAL RECORDS
401 Woodland Hills Blvd

HAWKINS,TERRY WAYNE
MRN: E1502158003

Printed by 8883 at 9/16/14 2:27 PM

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
--oOo--

CLESSA HAWKINS, as Special Administrator for TERRY HAWKINS, deceased, and CLESSA HAWKINS, individually,

Plaintiffs,

vs.

MERCY KANSAS COMMUNITIES, INC., D/B/A MERCY HOSPITAL FORT SCOTT; MARC ENYART, M.D.; ROGER PARRIS, M.D.; and AMY SACHUA, M.D. and SHANNON MEEK, R.N.,

Defendants.

Case No. 2:14-CV-02405

DEPOSITION OF JOE D. HAINES, M.D.
WEDNESDAY, SEPTEMBER 16, 2015
Reno, Nevada

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, PA 19103

EXHIBIT
2

that doesn't show an elevated or a reduced white blood count, in other words it's normal; correct?
A Correct.
Q And then on January 9th they again took his white blood count and it was 6.4. Again with the reference range of 4.3 to 11 you would agree that was normal; correct?
A That's within the normal range.
Q They did an influenza swab at Via Christi; correct?
A Correct.
Q How did that come back?
A I believe that was negative.
Q Now, have you ever given the opinion that you need to rule out the most critical in each case in terms of potential diagnosis when a patient comes into the ER --
A Yes, sir.
Q -- before proceeding?
A Yes, sir.
Q And I think you gave an example of if a patient comes in lifting a box and has a complaint of chest pain you have to assume it's a heart attack and work it up; correct?
A Well, I don't think you have -- No, you

wouldn't assume it was a heart attack. You would put that in the differential diagnosis, correct, yes.
Q Assume is a bad word.
It would be within your differential; correct?
A Correct.
Chest pain you worry about the worse thing, which would be a heart attack.
Q And you would work that up; correct?
A You would rule it out.
Q To rule it out what you would do potentially is put him in ICU, put him on monitors, do an EKG, observe him for 24 to 48 hours and then release him; correct?
A No, you wouldn't need to go to that extent. You could just do an EKG, do some troponin levels and let him go, because that will pretty much rule out a heart attack.
Q Are there false positives on that and false negatives?
A Well, EKG is only about 50/50. Troponin levels are pretty accurate. You're also going to do a history, a physical examination. You're not looking at two isolated tests and say okay, that's my decision.
Q So every patient that comes into the ER with a complaint of chest pain you're going to do an EKG and troponin levels?

A Not every patient, no. You have to use a little judgment.
Q Clinical judgment?
A You should.
Q So is clinical judgment important in assessing patients' conditions in an emergency room?
A Sure.
Q And we can agree that when Dr. Enyart did his assessment you weren't there; true?
A True.
Q He's the one that is making the clinical judgment; correct?
A Correct.
Q Now, if you saw Mr. Hawkins on January 5 with the history of 11 days of symptoms and you thought there was a potential viral condition going on, let's say viral pneumonia, what would you prescribe?
A Well, I would work him up first. I wouldn't just hand a prescription to him.
Q Let's assume in your differential you're saying I think it's pneumonia, I think it's potentially bacterial and viral, what are you going to prescribe, bacterial or viral?
A Well, you're jumping way ahead. First you have to have a diagnosis before you start prescribing.

Q Let's say hypothetically I have now made a diagnosis of I think there's pneumonia, but I don't know if it's viral or bacterial. What do I prescribe at that point?
A If the patient is not toxic and if he is -- if his laboratory work looks normal, if he is stable and you don't need any other work-up at that point and you think it's a community acquired pneumonia you would typically prescribe an antibiotic.
Q Anything else?
A Well, you would follow him up certainly. You know, you wouldn't give him a Rocephin shot and then turn him loose. That is only good for 24 hours. So if you're going to commit a patient to Rocephin as they did, you need to give it at least three days and then you need to have that patient come back daily to be rechecked.
Q Okay.
Anything else you would give for the viral side?
A You know, he is -- Tamiflu is something that you can give for an viral influenza. However, you know, the window is usually 48 hours on that and he is past that window. So I probably would not give an anti-viral at that point. I would be concerned why is he still

Page 82

having symptoms after 11 days of illness and I probably would try to do some cultures, get some sputum, do a gram stain on that, you know, culture the sputum, have that cooking so that when I saw him back 24 hours later I would have a better idea of his diagnosis.

Q Did you assume that Dr. Enyart gave a shot of Rocephin to treat potential pneumonia?

A I think he was trying to treat the sinusitis, which is odd. That is not typical treatment for sinusitis.

Q Did you read his deposition on why he gave the shot of Rocephin?

A I have read it, but I can't remember what his rationale was on that.

Q Did you read his deposition on why he gave a steroid shot?

A I remember reading his deposition, but of course a steroid is not indicated in this patient. So it doesn't really matter why he gave it.

Q So in your opinion a steroid shot wouldn't be indicated if he had sinusitis to reduce the swelling --

A No.

Q -- in the nasal congestion area?

A No, no.

Q Now, you indicated here that if he diagnosed

Page 83

sinusitis that he gave the wrong prescription. He should have given Augmentin rather than Amoxicillin; is that correct?

A Right, something like Augmentin. You could also give a Fluoroquinolone, but Amoxicillin there's far too high rate of resistance for that to be effective with sinusitis during this time period and continues on today.

Q What are the side effects of Augmentin?

A Gastrointestinal primarily.

Q According to the family's deposition, did Mr. Hawkins have a history of gastrointestinal problems going on?

A I believe he may have. I don't recall that specifically.

Q Have you read any literature -- Have you ever read the IS -- or IDSA clinical practice guidelines for acute bacterial rhinosinusitis in children and adults?

A I don't think I have read that one.

Q So if it says that the evidence is weak giving Amoxicillin Clavulanate rather than Amoxicillin alone as empirical anti-microbicidal therapy for sinusitis in adults, you don't agree with that?

A No, I wouldn't agree with that, no.

Q Okay.

Page 84

What is your background in infectious disease?

A You know, 34 years of doing family medicine. I see infectious diseases every day.

Q What was your training in it?

A Oh, the typical training that a family practitioner goes through, you know, the three years. It's part -- It's incorporated into all the rotations, pediatrics, internal medicine, surgery, and then of course we have rotations that are specifically devoted to infectious disease only.

Q How long --

A I can't tell you how long. I mean it was over a three year time period.

Q How long was each rotation?

A Each rotation is a month and that -- but you can't really separate out infectious disease from, you know, the rest of medicine. It's part of everything, and I'm not saying Augmentin is the only choice. Levaquin could have been a good choice, I mentioned that earlier, a Flouroquinolone. Amoxicillin is just a very poor choice because of the resistance.

Q Was there any evidence in this case -- Strike that.

You read Dr. Enyart's deposition. Did he indicate insurance coverage played any factor in his

Page 85

clinical evaluation of Mr. Hawkins?

A He denied that.

Q What did he say about it?

A Well, I can't quote you the deposition unless you want me to dig it out.

Q Well, didn't he say Mr. Hawkins was the one that brought up the insurance issue, that he didn't have it and he didn't want to run up a lot of bills if he could avoid it?

A I don't recall that specific statement, but I have known patients to say that.

MR. HUDSON: Do you want to take a break?

MR. WRAY: Yes.

(A recess was taken.)

BY MR. HUDSON:

Q We're back on the record.

We were talking earlier about Tamiflu. Have you ever given the opinion that it's below the standard of care to give Tamiflu to a patient if you're giving it after the first 48 hours of illness?

A I don't know if I have specifically said that. It's possible. The manufacturer says it's really not indicated, you know, after -- I think some sources even say 23 hours, you know if it's beyond 23 hours it's not indicated, you know. So I think it does very little

good. I'm not a big fan of it.

Q Okay.

Now, back on your report, Exhibit 5, I believe it is, and on page 3 we're again talking about standard of care relative to Dr. Enyart. Your sixth area that you indicate standard of care required was that Mr. Hawkins be admitted to the hospital for treatment of pneumonia?

A Correct.

Q Was his O2 sat normal at 96 percent?

A Yes, at that time it was.

Q Was his blood pressure normal?

A Yes.

Q Do you admit all patients to the hospital for treatment of pneumonia?

A Most, unless they are young and healthy, then I will treat them as outpatients.

Q What is the appropriate antibiotic based on your training and experience for pneumonia, first line?

A If it's community acquired pneumonia?

Q Right.

A Then I would probably go with a Macrolide or a Fluoroquinolone.

Q Levaquin?

A Levaquin is a Flouroquinolone, correct.

Q Now, is IV administration of Levaquin more rapid than an oral administration of Levaquin?

A I think the absorption is more rapid, yes.

Q How much?

A I don't know.

Q So is it your opinion that if Levaquin is going to be administered or ordered in this case it should be ordered IV as opposed to oral?

A Not necessarily.

Q I think I asked you this, and if I did I apologize because I didn't write down the answer.

You indicated in your opinion he should have been hospitalized for treatment of pneumonia on January 5, 2014. If he was hospitalized and treated for pneumonia what was the treatment?

A The treatment typically would be IV antibiotics and oxygen and chest X-ray and if it was negative a CT Scan of the chest, consultation, you know, with a specialist, if needed, and close monitoring and observation.

Q If his O2 sats were 96 percent are you going to put him on oxygen?

A Not at that moment. I would monitor his oxygen rate over the next 24 hours and if it dropped below 93 I would consider oxygen.

Q How about 92?

A Yeah, 92 I would definitely put him on oxygen.

Q As opposed to 93?

A 93 I would probably put him on O2 as well, if he was at all tachypneic or dyspneic.

Q What if he wasn't tachypneic?

A If he had a 93, you know, that's the cutoff. So I would probably continue to watch it closely.

Q Have you ever seen any medical literature talking about 92 being the cutoff?

A I -- Probably, but that is one point. You can't really hang your hat on one point. You have got to look at your patient.

Q Okay.

By the way, in your opinion did the fact that Dr. Enyart prescribed Amoxicillin rather than Augmentin have any causal factor to Mr. Hawkins' overall condition?

A I don't think the Amoxicillin had any effect on him whatsoever. I think his disease course went ahead and progressed despite the Amoxicillin. Is that your question?

Q No, my question is a little different.

Are you saying had he been given Augmentin as opposed to Amoxicillin there would have been a different

outcome in this case?

A Probably not, yeah.

Q As to Dr. Parris, this again is on page 3, you say he ensured the patient was checked into the ER and fully evaluated and admitted to the hospital as previously recommended if his symptoms had not improved or worsened.

As to that issue, does the patient, if you know, in the setting at Mercy Hospital have the right to sign in to be seen in the ER or elect not to sign in to be seen in the ER, does the patient have that right?

A Yes, I believe so.

Q If a patient elects not to sign in to be seen is there any obligation on the emergency physician, just under that scenario, those facts alone to see the patient?

MR. GULICK: Object to the form of the question.

THE WITNESS: Well, the patient presented to the ER to be seen.

BY MR. HUDSON:

Q My question was signed in?

A Signed in?

Q Right, registered.

A He should have been signed in, yes.

Page 114

Q Why not just hospitalize him?
A Well, because it's quicker to get somebody hospitalized going through the emergency department and it's quicker treatment because you can start the treatment in the emergency department and then send him up to the floor. If you admit him directly to the floor they may sit around for hours before they get their medication.
Q And then you said a specialty consultation. What consultation?
A Somebody that understood about pneumonia and sepsis and how to treat it.
Q Who would that be, what specialty?
A Internal medicine would do it, pulmonology could do it, infectious disease. What else? There's a number of people that could do it. A good family physician could do it.
Q All right.
Now, you go on to say I have concluded the proper standard of care for evaluating and treating pneumonia. What type of pneumonia was this?
A I think he began with viral pneumonia and then it went into a bacterial, secondary bacterial infection.
Q Where is the evidence there was a bacterial infection?

Page 115

A I'm not sure if the autopsy, they just said pneumonia. I think there was a culture of something that had strep in it. I'm not sure where that is at.
Q Is that at Via Christi?
A I don't know. It could have been at the other facility where they transferred him to.
Q St. Luke's?
A Yeah, it could have been.
Q Well, let me ask you this, then, through the time that he got to Via Christi, he was there for how many days?
A I don't remember the exact number of days, several days before he --
Q He was there four. So on the four days they had him on antibiotics; correct?
A Right.
Q So assuming that the culture they did there immediately when he got there the 8th came back negative, they put him on antibiotics, wouldn't that tend to rule out any bacterial infection?
A No, not necessarily. The cultures are not a hundred percent and he developed ARDS, which is an inflammatory process in the lungs and that's a consequence of the infection, and so yeah, you know, sometimes you don't get an answer.

Page 116

Q Can that be from an viral pneumonia?
A It's possible. H1N1 is what they thought, so that's a possibility.
Q Is there any specific treatment for viral pneumonia?
A It's largely supportive care, ventilatory support, that sort of thing, and you can give antivirals. There are antivirals that are given for viral pneumonia.
Q What are they?
A I don't know. I call infectious disease guys to do that. That is beyond the scope of my practice.
Q So you would leave that opinion to the infectious disease guys?
A Yeah, which type of antiviral to use, yes, I would defer on that.
Q You go on to say for evaluating and treating pneumonia and sepsis in Terry Hawkins. What evidence is there that he had sepsis on January 5, 2014?
A Well, there is not a lot of evidence on that particular day. I think between the 5th and the 8th he became septic.
Q What evidence is there on the 8th he was septic at Fort Scott?
A Blood pressure was dropping.

Page 117

Q At Fort Scott?
A No, not at Fort Scott. That would have been at Pittsburgh.
Q So at Fort Scott what was the evidence that he was septic at Fort Scott?
A Well, we don't know because they didn't really work it up. They didn't do blood cultures or treat him appropriately so we don't know exactly the time that it began.
Q Well, you say here he was septic at Fort Scott, so I'm just curious what is the evidence?
A You can't put a time on it.
Q No, I'm not asking a time. I'm saying what is the evidence that he was septic in Fort Scott, if any?
A On the 5th?
Q On the 8th.
A On the 8th, his deterioration and the fever going up to 104 degrees.
Q The fever went to 104. What else? You say his deterioration. What about the physical exam showed he was deteriorating?
A Well, you know, the physical exam they recorded is all normal, which is hard to believe.
Q I move to strike that last comment. It's not responsive to the question.

Page 138

before I offer an opinion on EMTALA I better know what it is?
A Yeah, I knew what it was, that you can't dump patients on another facility obviously and you needed to screen people, but I thought I would take a look at it just to be sure that I hadn't hallucinated or something.
Q Is it your understanding that EMTALA would allow a hospital to screen a patient for an emergency medical condition and if they found no such condition that they could discharge the patient without further obligation?
A According to the federal government?
Q According to EMTALA?
A I don't know. I'm not a -- I think if a patient presented themselves, every facility I have worked in they have to be seen.
Q I'm focused on the screening requirement of EMTALA.
A If they screened them and then they kicked them out?
Q They screened them, they said you don't have an emergency medical condition, is it your understanding based on your research or training or whatever under EMTALA the hospital can discharge that patient without further obligation?

Page 139

A You know, I don't think so. I think if they are receiving Medicare funds, doesn't that patient have to be seen? That's my understanding.
Q Well, they have seen them, they have screened them, they have decided they are not having an emergency medical condition. Under your understanding of EMTALA, because you're here to offer opinions on it --
A Right.
Q -- can a hospital discharge the patient without further obligation?
A I don't know.
Q What constitutes an emergency medical condition under EMTALA?
A I can't quote you the act, like I said. The two things that I told you about are pretty much all I know about EMTALA.
Q So what constitutes an emergency medical condition as defined by EMTALA you don't know?
A Don't know.
Q Who is permitted to perform an EMTALA screening, do you know that?
A Yeah, that has to be a licensed practitioner, provider
Q What kind of provider?
A Physician in most instances, although that can

Page 140

be delegated down to a physician's assistant, a PA or nurse practitioner.
Q Do you believe that EMTALA mandates that hospitals provide a physician, advanced registered nurse practitioner or a physician assistant to perform an EMTALA medical screening?
A Yes, I believe that is the case. I don't know if it's true, but that's what I think.
Q Well, okay.
I will tell you this --
A You know more about EMTALA than I do.
Q It either is or is not.
A You know it much better than I. I'm not an EMTALA expert, like I said.
Q Okay.
Indulge me with these questions. Do you have any special certifications in EMTALA?
A No.
Q Do you have any sort of specific appointments in the military that you're the EMTALA coordinator of any particular place?
A No, sir.
Q Do you have a -- Have you ever given any CMEs or speeches on EMTALA?
A No, sir.

Page 141

Q Have you ever attended any?
A No, sir.
Q Do you agree that pneumonia, just that diagnosis, is not necessarily an emergency medical condition?
A It may or may not be.
Q It depends on acuity; correct?
A Correct.
Q There are acuity scoring guidelines that are available in the medical literature; correct?
A Correct.
Q There are a few of them, they vary slightly, but generally the idea behind these guidelines are to determine whether or not a patient is having an pneumonia emergency and whether or not to admit the patient; correct?
A Correct.
Q And did you go look for those scoring guidelines in your review of this case?
A No, I don't -- With my level of experience I don't score patients any more. I can assess them clinically and determine whether they need to be in the hospital or not.
Q Would you agree with me that a reasonable and prudent practitioner could look to those guidelines for

guidance in determining whether or not a patient could be treated on an outpatient or inpatient basis?
A That's fair.
Q Do you think that would help us in this case in determining whether the standard of care required an admission of Terry Hawkins based on his condition at any given point in time?
A It might have some bearing on it.
Q Could we agree that if Terry Hawkins had pneumonia on January 5th, 2014 he would have been scored as an outpatient?
A Without a chest X-ray it's impossible to say.
Q Well, the pneumonia scoring guidelines actually take it as -- I would say this, for purposes of these questions we can take it for granted that we have a diagnosis of pneumonia by whatever means, chest X-ray or anything else.
A All right.
Q So if we assume for the purposes of these questions that Terry Hawkins has pneumonia --
A On the 5th?
Q On the 5th, do you agree with me that he would have scored as an outpatient?
A You know, again I don't use the scoring system, but I think it's possible that, you know, based on the

chest X-ray that he could be treated as an outpatient, yes.
Q The chest X-ray actually does not come into play in the scoring guidelines; correct?
A I don't know what guidelines you're referring to so -- Most of them are based on vital signs and physical findings, I believe, yes.
Q Right, because we say we have a diagnosis of pneumonia, but now what we're trying to figure out is are you stable?
A Right, and to give you an example, I have lots of young healthy Marines that have pneumonia and I can see it on the chest X-ray, but I feel comfortable treating them as an outpatient. So yes, there are situations where that is appropriate.
Q If we agree that -- Strike that.
Do you agree that Terry Hawkins' vital signs on January 5, 2014 were stable?
A They were in the normal range, yes.
Q Do you agree that if he had pneumonia observing him on an outpatient basis would have been appropriate within the standard of care?
A Provided he was checked every 24 hours, that's the standard.
Q What do you expect to occur if he's checked

every 24 hours?
A Repeat the vital signs, repeat the physical examination, repeat the chest X-ray, and get kind of a gestalt for is he getting better or getting worse.
Q You have reviewed the entirety of the case, you have reviewed the records from Mercy Fort Scott and Via Christi; correct?
A Yes, sir.
Q And based on what you have read in retrospect do we believe that Terry Hawkins' vitals signs were most likely stable on January 7th?
A On the 7th, yeah, I believe they were still in the normal range on the 7th.
Q What about the 8th when he arrived initially at Via Christi based on what we have reviewed today?
A Now, on the 7th, wait a minute. Did he have vital signs -- He wasn't checked into the emergency room so did they -- so he probably didn't have vital signs performed on the 7th.
Q Well, I just want to make sure we understand, because I think what you said just a minute ago is you thought that his vital signs were probably normal on the 7th?
A Oh, no, I couldn't say that. They certainly could have been abnormal. They should have been taken

on the 7th.
Q If we assume hypothetically that Terry Hawkins has sepsis, as you have contended, or he is beginning to progress into sepsis.
A Right.
Q Then there should never be a time if it's left untreated that his vital signs improve; correct?
A Well, they shouldn't be improving. They can vary, though. Vital signs are not steady as a rock. They vary.
Q They are not, but if we say -- if we say that we would have taken vitals on January 7th?
A Right.
Q Don't we have to say since they were essentially normal when he walks in on the 8th they were probably normal on the 7th?
A Probably so.
Q Okay.
A Yeah.
Q So do we agree that Terry Hawkins becomes unstable at some point when he is in the emergency department at Via Christi on the 8th?
A Yeah, it's -- Well, at some point on the 8th, yeah. He certainly started before he got to the hospital.

Page 146

Q Some point on the 8th, but before he got to Via Christi you mean?
A Right, because he -- you know, he crashed at home, I believe. He became a lot worse at home, deteriorated, you know, and then by the time he got to the hospital then, yeah, they checked him in and then he crashed.
Q But when they checked in him at Via Christi his initial vital signs were still normal?
A At that moment in time, yeah.
Q And then we talked about some initial vital signs that were taken at triage. Those were the normal ones and you said after awhile they progressively declined; correct?
A Correct.
Q But at 1930, and in fairness so you can look this up, page 12 of the ER record, at 1930 on the 8th, so about an hour and a half after he comes in, I think, his blood pressure systolic is 123, which is actually up from the 111 we talked about in triage; correct?
A Right, but that's not a significant difference.
Q Well, it's certainly above where it was at 111?
A Yeah, but it's -- You can't really hang your hat on a ten millimeter mercury difference.
Q Well, his pulse rate was 82; correct?

Page 147

A Correct, that's normal.
Q His respiratory rate was 20?
A That's normal.
Q But if we take those on the whole those are still normal vital signs; correct?
A At that point, yes.
Q And at that point at 1930 at Via Christi he actually had not yet been admitted to the hospital; correct?
A Well --
Q He's still sitting in the ER?
A Technically they haven't got him a bed upstairs, but he is admitted to the emergency department, yeah.
Q Did you see that the Via Christi records referenced the time of the admission decision was 2150?
A I take your word for it.
Q And I will just say for the record that page 7 of 7 of the emergency room report, which is Bates stamped 020017 states decision to admit discharge 2150 disposition admitted as inpatient, condition improved. If you would like to see that --
A No, I believe you.
Q So would you agree with me that they made a decision within -- while Terry Hawkins was in the

Page 148

emergency department of Via Christi that he looked at that point like he was getting worse from the time they started seeing him and they made a decision to admit roughly getting close to three hours after he arrived?
A Okay.
Q Is that true?
A Sure, yeah.
Q Okay.
Now, there was some testimony that you gave earlier that you said you felt like Mercy Fort Scott treated Mr. Hawkins like a second class citizen. Do you recall that?
A Yes.
Q Is that your belief?
A Based on my years of experience in working in emergency rooms I have come to understand that, you know, people that present that are dishevel, that are poor hygiene, that don't have insurance are not treated as well as somebody like yourself that presented to the ER.
Q Well, to be fair you have no experience with the Mercy system; correct?
A Right, it's just another hospital, yeah.
Q Never worked for them?
A No.

Page 149

Q Don't know how many hospitals they have?
A No.
Q Do you know whether they are for profit or not for profit?
A If Mercy is in their name they are probably not for profit.
Q Pretty good indicator, right?
A Probably a Catholic hospital.
Q Exactly right.
Do you know what the Mercy mission statement is?
A No.
Q Did you know that was an exhibit to the evidence in this case?
A No, it wasn't really relevant to my analysis.
Q Is it relevant to your analysis what the hospital's profit status is, what its mission statement is, things like that before you reach a conclusion that Mercy Hospital treats uninsured patients like second class citizens?
A I said this patient. I didn't say other patients. I don't know anything about it. I just know about this one case.
Q Why would they treat Terry Hawkins differently than other uninsured patients?

Veritext Legal Solutions
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

more probable than not that he doesn't have bacterial pneumonia because we have no evidence that he does; true?
A We don't have that, yeah.
Q So what was pulled from him, the bugs that we referred to before were things that his critical care physician at St. Luke's attributed to the ventilator. Do you recall that?
A Contaminants.
Q I want to make sure the record is clear, contaminants are just that, they are bacteria or other bugs, so to speak, that find their way into the patient through the use of the actual mechanical ventilation, is that a fair assessment?
A Right, they are not pathogenic.
Q In other words, those weren't the cause of what brought him to the hospital; correct?
A Right, it's a hospital acquired contaminant, yeah.
MR. WRAY: Let me take a real quick break.
(A recess was taken.)
BY MR. WRAY:
Q Dr. Haines, I neglected to reference Exhibit Number 8, which are notes that you have brought today.
Are those notes that you made while you were

reviewing the case?
A No, these were -- Well, yeah, I just made them in the last couple of days as I was refreshing my memory.
Q Have you used those to refresh your memory today?
A Yes, sir.
MR. WRAY: I don't have any further questions. Thank you for your time.
THE WITNESS: Thank you.

EXAMINATION
BY MR. GULICK:
Q Dr. Haines, I want to ask you a couple of questions.
One you were asked about the vital signs on the 5th. Mr. Hawkins on the 5th when he was in the emergency department had a pulse of 105; correct?
A Correct.
Q That's tachycardic, isn't it?
MR. HUDSON: Object to the form of the question as leading and suggestive.
BY MR. GULICK:
Q Is that tachycardic?
A Yes, anything above -- a hundred and above is

considered tachycardia.
Q Is that abnormal?
A Yes, it is.
Q Did Mr. Hawkins in the emergency room on the 5th have a temperature of 101.7, I think it was?
A Yes, sir.
Q Is that normal or abnormal?
A That's abnormal. That's a fever.
MR. GULICK: Okay.
That is all I have, Doctor.

FURTHER EXAMINATION
BY MR. WRAY:
Q Dr. Haines, I asked you just a few minutes ago if the vital signs on January 5th were normal and you said yes.
A Yes, I gave you the incorrect answer.
Q So after we took a break you have come back and now you have said the vital signs on January 5th were abnormal?
A Well, yes, obviously they were. I misspoke when you asked me the question.
Q So were those vital signs that you just referenced, the tachycardia is roughly five beats per minute above what would otherwise be normal for the

general population; correct?
A Correct.
Q Was Terry Hawkins considered obese?
A I believe he was overweight, yeah.
Q He was 5'11, 250; right?
A Yes.
Q That's obese?
A I would say obese, yes.
Q Do those patients have higher heart rates?
A They can if they are in poor physical condition.
Q You certainly wouldn't consider a heart rate of 105 to be alarming; correct?
A It depends. A normal heart rate would be -- for a resting heart rate would be 70 to 80 for most people. So 105 is not alarming, but it's concerning. It's abnormal.
Q You don't look at Terry Hawkins' presentation of vital signs on the 5th and say that he is septic, do you?
A No, sir.
Q If Terry Hawkins was trending towards sepsis on January 5th, you agree with me there is no chance he lives until January 8th; correct?
A Without treatment typically not.

Q And the contention in the case is that he didn't receive treatment; right?
A Correct. Well, he received, you know, inappropriate treatment.
Q If he was septic he would at a minimum probably require vasopressors?
A He would have been hypotensive.
Q And he is not; correct?
A No, not at that time. He was sick. He had a fever and he had tachycardia and so that qualified him to be a sick patient.
Q He was not, though, unstable?
A Correct.
MR. WRAY: Okay.
MR. HUDSON: I don't have any questions.
MR. GULICK: That's it.
Do you want to read and sign?
THE WITNESS: Yeah, let's do that.

--oOo--

STATE OF NEVADA )
) ss.
COUNTY OF WASHOE )

I, JANET MENGES, a notary public in and for the County of Washoe, State of Nevada, do hereby certify;

That on Wednesday, September 16, 2015, at the hour of 1:00 p.m. of said day, at 1111 Forest Street, Reno, Nevada, personally appeared JOE D. HAINES, M.D., who was duly sworn by me to testify the truth, the whole truth, and nothing but the truth, and thereupon was deposed in the matter entitled herein;

That said deposition was taken in verbatim stenotype notes by me, a Certified Court Reporter, and thereafter transcribed into typewriting as herein appears;

That the foregoing transcript, consisting of pages 1 through 178, is a full, true and correct transcript of my stenotype notes of said deposition to the best of my knowledge, skill and ability.

DATED: At Reno, Nevada this 21st day of September, 2015.

_______________________
JANET MENGES, CCR #206

Hawkins v. Mercy Kansas Communities Inc
Dr J.D. Haines
INSTRUCTIONS TO THE WITNESS

Please read your deposition over carefully and make any necessary corrections. You should state the reason in the appropriate space on the errata sheet for any corrections that are made.

After doing so, please sign the errata sheet and date it.

You are signing same subject to the changes you have noted on the errata sheet, which will be attached to your deposition.

It is imperative that you return the original errata sheet to the deposing attorney within thirty (30) days of receipt of the deposition transcript by you. If you fail to do so, the deposition transcript may be deemed to be accurate and may be used in court.

2135241

Hawkins v. Mercy Kansas Communities Inc
Dr J.D. Haines
ERRATA
- - - - -
PAGE LINE CHANGE

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________
Reason:_______________

___ ___ _______________

2135241

IN THE CIRCUIT UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

CLESSA HAWKINS, as Special, )
Administrator for TERRY )
HAWKINS, deceased, and CLESSA )
HAWKINS, Individually, )
Plaintiff, )
vs. ) Case No. 2:14-CV-02405
MERCY KANSAS COMMUNITIES, )
INC., D/B/A MERCY HOSPITAL )
FORT SCOTT, MARC ENYART, M.D.,)
ROGER PARRIS, M.D., and AMY )
SACHAU, M.D., and SHANNON )
MEEK, R.N., )
Defendants. )

DEPOSITION OF KENNETH STEIN, M.D., taken on behalf of the Defendants, at the Homewood Suites, 840 Chesterfield Park West, in the City of Chesterfield, State of Missouri, on the 4th day of September, 2015, before Eileen J. Bell, Certified Court Reporter #833.

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, PA 19103

EXHIBIT
3

Page 50

A. You mean administrative at the hospital?
Q. Yes.
A. The only administrative is there is one meeting I have to go to once a month on the pharmacy and therapeutic committee, which is one hour.
Q. What's your definition of standard of care?
A. The standard of care in a legal context, and that varies from jurisdiction to jurisdiction, is what a reasonably trained and prudent physician would do or would not do in a like or similar circumstance.
It's not something that's found in the textbook or that's put forth by medical society in a legal context. It's given the totality of the situation and the circumstances what a reasonable physician should or should not do.
Q. Do you agree within the standard of care there are judgment calls?
A. Yes, sir.
Q. Do you agree a bad patient outcome doesn't mean a departure from standard of care occurred?
A. Yes, sir.
(Thereupon, a short recess in the proceedings was had.)

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 51

Q. (By Mr. Hudson) Doctor, we're back on the record. I'm looking at your notes, Exhibit 2, in the first, very top part says I have a CD of radiology image. Do you see that?
A. Yes.
Q. Did you actually look at the films in this case?
A. I did way early. I don't remember exactly noting anything different than what the report says.
Q. That's what I was going to ask you. Do your notes anywhere say your interpretation after looking at those films personally, to your knowledge?
A. No.
Q. And I take it, you don't have an independent recollection here today of exactly what you saw. You're just saying generally I saw the radiologist's report, and have no general disagreement with what he said. Would that be a fair statement?
A. Yes, sir.
Q. You talk about, and I'm looking at Page 5, you're looking at the Via Christi records. And you're talking about they noted septicemia and septic shock. Did you ever see anything in the Via Christi chart supporting sepsis? In other words, was there

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 52

ever a positive culture?
A. So there is a difference between supporting sepsis and culturing something out. So sepsis basically means that you have systemic inflammatory response syndrome, and a proven or suspected infection. I do not remember them at Via Christi actually getting a positive blood culture that I remember.
Q. And, in fact, doesn't the def -- excuse me.
A. And having said that, often there is certain organisms, especially viruses or fungi that you may or may not be able to culture, or if antibiotics have already been initiated, that you may not get a positive culture result on it. Go ahead.
Q. Doesn't the definition of sepsis include a positive blood culture?
A. No. Proven or suspected infection is my understanding.
Q. Okay. So your definition is simply a suspected infection would meet the definition of sepsis; correct?
A. Right. Now, back to pyemia or what some people may call septicemia, although it's truly backed pyemia, requires a positive blood culture. But you

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 53

can have someone with a ruptured appendix who never gets a positive blood culture, and they can die. You can have someone with C difficile colitis, who never has a positive blood culture and they'll have sepsis or septic shock and die.
So my definition does not require a positive blood culture, nor do I believe an accepted definition requires it.
Q. Okay. Would you agree an 02 sat of 95 and above would be considered normal?
A. An 02 sat of 95 percent or above on room air would be considered normal, yes.
Q. In terms of a respiratory rate, what is considered a normal respiratory rate?
A. Generally it depends on what studies you look at, but usually we say 20 or less would be considered normal.
Q. And in terms of -- well, strike that. You would agree a normal BUN and creatinine would not be consistent with dehydration; correct? In other words, you would expect, particularly the BUN to be elevated if you had dehydration, significant dehydration present; correct?
A. Yes. Significant dehydration in a otherwise normal person, generally you would expect

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

14 (Pages 50 to 53)

the BUN to be elevated, correct.

Q. You would agree that the medical literature as of early 2014 relative to Tamiflu indicated after 48 hours it's not called to be administered. In other words, it's shown to be of no major benefit after 48 hours of flu symptoms; correct?

A. If you're talking about a general person with the flu, Tamiflu has been shown if given within 48 hours to decrease the duration of the illness and possibly the severity by about one day, I believe; however, if you have people who have severe life threatening or potentially life threatening or potentially severe pneumonia, etcetera, from influenza, it is fairly common to go ahead and put them on Tamiflu.

And that's separate from whether or not it's going to decrease how it effects the normal flu. And I will defer that research because I haven't personally read all those studies, but they were stated by the infectious disease expert.

Q. What's your definition of severe pneumonia to put them on Tamiflu?

A. So if you have someone who's ill enough that you are hospitalizing them with the pneumonia that you suspect is related to influenza, that would

be indication to go ahead and start them on Tamiflu.

Q. And do you have any medical literature that supports that position?

A. I specifically do not. I would go ahead and once again defer that part to the infectious disease expert. If there is an opposing infectious disease expert that's bringing up literature, I would also be interested in that.

Q. What are the signs of sinusitis?

A. So generally sinusitis would be a pressure feeling in the sinus areas, which can be the frontal sinuses, the maxillary sinuses. Generally they may have some, what's referred to mucus or mucopurulent drainage. They may have a low grade temperature. They generally do not have -- and we're talking about acute, uncomplicated sinusitis; sir?

Q. Yes.

A. Generally they don't have high fevers. Generally they don't have other systemic symptoms that go along with it. If you have someone who is immunocompromised, they may be at risk for other complications or abnormal or unusual organisms that may be causing the sinusitis.

Q. And when you say a low grade temperature, below what? What's low grade to you?

A. Usually 101 or below, 101.5. More like a cold type, mild elevation. And you would need to check the various research that's out there that supports that, but that's my basic understanding.

Q. And then what are the symptoms of sinusitis?

A. Generally it's a pain and a pressure sometimes in those areas. Sometimes they may have a headache that goes along with it, but they're not going to have neck stiffness. They're not going to have altered mental status. They're generally not going to have systemic overall symptoms.

If they have a cough, usually it's more because they're having some postnasal drip that might be irritating, causing a bit of a cough. It doesn't usually cause chest pain. You would need to look for other things if they're getting chest pain along with it.

Q. Would you agree that the signs and symptoms of Mr. Hawkins on January 5, 2014 support a diagnosis of sinusitis?

MR. JOHNSON: Objection to form. Go ahead, Doctor.

A. Let me go to my note. Hold on a second. When he has a cough, sinus pain, pressure,

intermittent fever, that part on its own, can go along with it. When you have more diffuse myalgia, you have chest pain that goes along with more than that. When you look at the record and the testimony of Dr. Enyart who's saying, well, strong chance it's going to be the flu, you need to kind of think of more than that. Flu doesn't generally for last 11 days still having a fever that you measure there in the ER of 101.7.

So although there are some signs that there might by some inflammation of the sinuses, sinusitis, simply uncomplicated sinusitis by itself, it would not be reasonable to conclude from his presentation that that's what's going on.

Q. (By Mr. Hudson) Okay. So your opinion that it's not reasonable to conclude that what's going on is based upon the diffuse myalgia and the chest pain, and the fact that it's been there for eleven days; is that correct?

A. Correct. And he started off thinking or describing as to like why he's not getting the flu, that's it's going on for 11 days, getting the flu swab is not going to be really helpful, at least the way it was implied, that starting Tamiflu from his impression, if it was just garden variety influenza, would not be beneficial at that point.

have made the decision to not see the Doctor because he was told the antibiotic is not going to be changed. And that may persuade the patient making an improper decision.

Q. Okay. If, in fact, Jessica Bybee testified on Page 6, I know it was a second time January 7th because they told him that they wouldn't see him again because it hadn't been 72 hours, assuming that's her testimony.

A. Yes.

Q. You would agree in that instance there is no causation as to any alleged departure from standard of care by Dr. Parris; true?

MR. JOHNSON: Same objections I made earlier on the same question. Go ahead.

A. There would be a separate issue then. There would be a breach of the standard from Dr. Parris for stating I'm not going to change the antibiotics. The main problem in that point, if the nurse said he will not see you for 72 hours, the main problem as far as causation would then go on the nurse.

Q. (By Mr. Hudson) Now, I want you to assume Jamie Hawkins has testified that she understood or was told that the reason why the doctor wouldn't

see him on January 7th was because there was no insurance. Assuming that occurred, you would agree again no causation by Dr. Parris, if Mr. Hawkins was told that was the reason why they wouldn't see him?

MR. JOHNSON: Same objections. Go ahead.

A. Unless if for some reason Dr. Parris had said he wouldn't see him without insurance, although I see no evidence that Dr. Parris made that decision, but if the patient was told he would not be seen because he did not have insurance, and it did not come from Dr. Parris, you cannot blame that on Dr. Parris.

Q. (By Mr. Hudson) If Dr. Parris told the nurse he wouldn't change the Amoxicillin antibiotic because it hadn't had time to work, his thinking in that instance was correct. In other words, 72 hours -- or 48 hours would potentially not be enough time to allow the Amoxicillin to work; true?

A. The basic underlying thought process might be correct, but he doesn't have sufficient information about the patient's condition to give advice on his medical condition.

Q. And if Dr. Parris was simply passing on his practice thoughts that he wouldn't change the antibiotic yet. It hadn't had time to work, that would have been a correct statement by him, would it

not, his practice thoughts, that it hadn't had time to work?

MR. JOHNSON: Incomplete hypothetical, argumentative. Go ahead, Doctor.

A. You may not see a full effect of an antibiotic at that point, but you can't just state I'm not going to change. You would need to say something, I need to evaluate the patient, see what's going on. Often that's not enough time to work. But you can't just give a blanket statement I would not change the antibiotic yet.

Q. (By Mr. Hudson) Have you ever answered a question from a nurse or a patient about the patient's treatment issue, and not actually seen the patient? Has that ever happened to you in an ER setting?

A. It's a pretty big, global question.

Q. I'm just asking you if it's ever happened.

A. I don't know. It may well have, I can't say for certain yes or no. It may well have.

Q. How many years have you practiced emergency medicine?

A. Oh, my God, since 1989, 26.

Q. Twenty-six years?

A. Yes, sir. '89.

Q. Okay. And, again, I don't want to be argumentative --

A. No, no, you're not.

Q. As I understand it, in those 26 years you can't think of one instance that a nurse or a patient has asked you a medical question about the patient that you have answered without seeing the patient; is that correct?

MR. JOHNSON: Objection, the question is over broad and argumentative. Go ahead.

A. There may or may not. I can't remember specifically. It doesn't mean it hasn't, sir. And I'm not being argumentative. I'm saying I can't remember a specific one. It may well have. I'm not denying that it may well have.

Q. (By Mr. Hudson) Do you have an opinion on what was the cause of Mr. Hawkins' signs and symptoms on January 5, 2014?

A. He was suffering from a consequence of H1N1 infection within a reasonable degree of medical certainty. I agree with the infectious disease expert that it's a little bit late onset for it to be only from that.

You wonder if there was a complicating bacterial infection on top of it; or if it was all

Page 98

just kind of delayed inflammatory response, but in that season, that time of year, those symptoms most likely it was H1N1 that was underlying it, which can be difficult to get a positive swab or culture on often.

Q. Okay. And you would agree, that's different than the opinion you expressed in your report, Exhibit 5, in that you said pneumonia, bacterial pneumonia; correct?

A. Hold on, hold on. I said that's something that I would have given antibiotic coverage for. Hold on a second.

Can you show me where it states specifically that it was bacterial pneumonia, sir?

Q. Well, I can state specifically you never mentioned viral and you certainly never mentioned H1N1 flu; correct?

A. I don't specifically mention whether it is or isn't, sir.

Q. Well, you never mentioned it was; correct?

A. Correct.

Q. And you've read the infectious disease expert's report since you issued your report. And it's now your opinion it was H1N1 infection; correct?

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 99

A. I also read the --

Q. Is that correct?

A. That is a partially correct answer, which does not fully allow me to explain that I have also read the deposition of Dr. Kozinn, who was the treating anesthesia based critical care trained, certified clinician.

Q. Now, you've indicated there is no medical literature you are relying upon for your opinions in this case; correct?

A. That I am specifically going to be citing?

Q. Correct.

A. I will be asking to read the literature that's brought up by other parties.

Q. Okay. And you haven't discussed your opinions with any other medical providers in this case; correct?

A. Correct.

Q. So the bottom line is the opinions you are giving today are just your opinions; correct?

A. They're my opinions based on the facts that are presented to me, the deposition testimonies, the medical records, deposition testimonies of treating physicians, as well as reviews from experts

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 100

that have already been mentioned by name.

Q. So have we covered all of your opinions as to alleged departures from standard of care by Dr. Enyart and Dr. Parris?

A. As far as I know as we sit here today that would be correct, sir.

MR. HUDSON: I don't have any further questions.

(Thereupon, a short recess in the proceedings was had.)

CROSS-EXAMINATION

QUESTIONS BY MR. WRAY:

Q. Dr. Stein, my name is Trevin Wray and I represent Mercy Hospital, and I also represent Shannon Meek, the nurse that's an individual defendant in the case.

I know you have covered a lot of ground with Mr. Hudson. I am going to try not to re-travel a lot of it, but I do want to go back and discuss a couple of things. You advertise your expert witness work. Do you do that as a corporate entity or do you do that as an individual?

A. Corporate entity, sir.

Q. What's the corporate entity called?

A. Interesting name, it's International

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

Page 101

Impressions, Incorporated.

Q. What's the basis of that name?

A. My wife is from overseas. We met overseas. We travel quite a bit. I love doing travel photography. And I thought that the name International Impressions would be a great name for a travel photography company. And then over the years the main emphasis of the company has kind of been more towards the medical/legal.

Q. Do you have any other shareholders in the Company?

A. My wife and I.

Q. Do you do any other kind of work through the Company, other than expert witness work?

A. Still do travel photography. I'm thinking one day I'll have the world's greatest tabletop book, but we'll see.

I do consulting, used to do a fair amount of consulting for pharmaceuticals companies, some consulting for biomed companies. There was -- and I keep forgetting, I think it was with the health care exchanges that were being set up as part of affordable care act.

There was a company that was working, consulting with physicians in different states about

VERITEXT NATIONAL COURT REPORTING COMPANY
215-241-1000 ~ 610-434-8588 ~ 302-571-0510 ~ 202-803-8830

26 (Pages 98 to 101)

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF KANSAS

CLESSA HAWKINS, as Special Administrator for TERRY HAWKINS, deceased, and CLESSA HAWKINS, individually,

Plaintiff,

vs. Case No. 14-cv-02405

MERCY KANSAS COMMUNITIES, INC., d/b/a MERCY HOSPITAL FORT SCOTT and MARC ENYART, M.D., ROGER PARRIS, M.D., and AMY SACHAU, M.D.,

Defendants.

VIDEOTAPED DEPOSITION OF DAVID PHELPS, M.D., a witness, taken on behalf of the Plaintiff, pursuant to Notice, on the 2nd day of July, 2015, at the law offices of Simpson Logback Lynch Norris PA, 7400 West 110th Street, Suite 600, Overland Park, Kansas, before

KAY L. MERLEY, RMR, CRR

for AAA Court Reporting Company, Registered Merit Reporter, Certified Realtime Reporter, and a Certified Shorthand Reporter of the State of Kansas.

APPEARANCES

For the Plaintiff:
MR. GLENN GULICK
JOHNSON, VORHEES & MARTUCCI
510 West Sixth Street
Joplin, Missouri 64801

For the Defendant Mercy Kansas Communities, Inc.:
MR. TREVIN E. WRAY
SIMPSON LOGBACK LYNCH NORRIS, PA
7400 West 110th Street, Suite 600
Overland Park, Kansas 66210

EXHIBIT
4

Q. **Okay. If you had a medical question regarding EMTALA, who would you talk to?**
MR. WRAY: Just note an objection to form.
A. I'm not sure I understand what you're asking.
Q. **(By Mr. Gulick) Well, one of the things that EMTALA requires is a medical screening examination. Are you familiar with that concept?**
A. Yes.
Q. **If you wanted to know what kind of medical screening examination was required, who would you talk to?**
A. I still don't quite understand what you're -- what you're asking me.
Q. **Well, let me broaden the question, then. If you had a question as to what type of examination in the emergency department was needed for someone who presented with particular respiratory complaints, who would you talk to?**
A. I'm not sure I'd have a question about what I would do with a patient when I was seeing them, so I don't know that -- I don't know that I have a good answer for you.

Q. **Okay. And why would you not ever have a question about what a screening examination was for a patient that had particular pulmonary or respiratory issues?**
A. Well, one of the issues or one of the procedures we have in -- in our emergency room is when a patient has checked in and is being seen and I come and see them, then I'm -- I treat them completely from beginning to end. I mean, I don't not see anybody. I -- I don't make a decision and screen somebody to go someplace else. We take care of them in the emergency room.
Q. **Okay.**
A. So it never really comes up.
Q. **Okay. So your understanding of a screening examination is what might be needed to send somebody somewhere else for treatment?**
A. Yes.
Q. **Okay. Does a medical screening examination have anyplace within how you work as far as trying to work up the patient, trying to decide what treatment the patient needs, even if it's in-house?**
A. Well, I suppose you'd have to say that we have a -- a way of doing things in the emergency room where patients check in. Their name is put up in our computer, in Epic. They're brought back to a room. A nurse does vital signs, often gets something of a chief complaint.

It is my way of doing things to look at the chart to get an idea of what's going on, and then I go see the patient, and then I provide care to the patient and make a disposition and make plans for whatever needs to be done. So that is what we do, and in that is the medical screening exam.
It is our policy, though, that we see everybody. We don't -- we don't send people, necessarily, to another facility or -- without completing a great deal of that.
Q. **Have you reviewed anything in preparation for this deposition?**
A. No.
Q. **Have you seen any depositions of other people that have been taken in the Hawkins case?**
A. No.
Q. **Have you looked at any of the medical records regarding Terry Hawkins?**

A. No.
Q. **Have you talked to Dr. Enyart, Dr. Parris, or any other medical provider regarding Terry Hawkins?**
A. Not about the patient. I talked to Dr. Enyart briefly just about how he was doing with the process. It's an upsetting process. But no details of the case were really revealed to me.
Q. **Okay. Do you know what happens with a patient before they actually come back to the examination rooms?**
A. I'm not in a position to be able to see that. Occasionally I can hear people talk at the front desk if there's -- but I don't -- I can't see that. And if we're busy, I don't hear it at all.
Q. **Okay. And you don't have anything to do with what that process itself is --**
A. No.
Q. **-- correct? Okay. I'm going to read from Exhibit 20. It says, "The emergency service at Mercy Hospital is provided an area of six rooms on ground level. The ED is under the supervision of the nursing service department**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CLESSA HAWKINS, as Special Administrator for TERRY HAWKINS, deceased, and CLESSA HAWKINS, Individually,

Plaintiff,

-vs-

MERCY KANSAS COMMUNITIES, INC. d/b/a MERCY HOSPITAL FORT SCOTT and MARC ENYARD, MD, ROGER PARRIS, MD., and AMY SACHAU, MD,

Defendants.

Case No. 2:14-CV-02405

V I D E O T A P E D
D E P O S I T I O N

The deposition of CLESSA HAWKINS, taken on behalf of the Defendants, pursuant to the Kansas code of Civil Procedure and by agreement before:

Shaun J. Higgins, RMR
Certified Shorthand Reporter
P.O. Box 1596
Pittsburg, KS 66762

a Certified Shorthand Reporter of Kansas, at the Mercy Hospital, Xavier Room, 401 Woodland Hills Boulevard, Fort Scott, Kansas, on the 20th day of January, 2015, at 9:01 a.m.

EXHIBIT
S

filled by I think you said your son, Burt --
A. Yes.
Q. -- filled it. Okay. When the pill bottle came back, did it have writing on it telling you how often your husband was supposed to take the medication?
A. Yes, it did.
Q. And do you remember what that said?
A. I think once -- twice a day.
Q. To your knowledge, did your husband ever fail to take the prescription during the timeframe it said on the label he was supposed to do it? In other words, if it was once a day, twice a day, whatever?
A. No, he took them.
Q. Okay. The morning of January 8, what time did your husband wake up?
A. I don't know, about 8:00, I guess.
Q. And January 8 would have been a Wednesday, did he go in to work that day?
A. No.
Q. Did you call in for him?
A. Yes.
Q. When you would call in to work, who would you talk to?
A. Oh, his lead personnel, Lindsey.
Q. Is that a guy or a gal?
A. It is a girl.

Q. And was that her first name or last name?
A. Lindsey is her first.
Q. Do you know her last name?
A. No, I don't.
Q. But she was your husband's lead person, is that what you said?
A. Yes.
Q. So you would have to call and tell her he wasn't coming in because -- for whatever reason?
A. Right.
Q. And what did you tell her on the 8th?
A. That he was still bad sick and I was taking him to the doctor.
Q. And, I'm sorry, you said he woke up about 8:00 a.m., ballpark, as best you remember?
A. Yes.
Q. So I assume you had already decided he wasn't going in to work that day?
A. Yes.
Q. Because otherwise he would have been up at 5:00?
A. Right.
Q. Okay. And when he woke up at 8:00 a.m., did you take his temperature?
A. Yes, I did.
Q. And when had he last taken Tylenol, you told me he

took none on the 7th, so when had he taken it before the 7th, the 6th?
A. No. Because he was on them antibiotics, he didn't take the Tylenol.
Q. Okay.
A. So it would have been the 4th would have been the last one.
Q. Okay. So 8:00 a.m., wakes up, does he take the antibiotic?
A. Yes.
Q. And did you take his temperature?
A. Yes.
Q. And what was his temperature the morning of the 8th?
A. 104.9.
Q. Did you give him Tylenol then?
A. No.
Q. When his temperature was 104.9, did he have any other complaints the morning of the 8th when he got up around 8:00 a.m.?
A. A headache, the fever, stomach ache, he said his chest hurt.
Q. Headache, fever, stomach ache?
A. His chest hurt.
Q. Chest hurt, anything else?
A. Diarrhea and throwing up, and, he was, like, you know,

like gasping for air.
Q. Okay. Anything else that you remember?
A. No.
Q. And that's when he woke up around 8:00 a.m.?
A. Yes.
Q. So what did you do?
A. We had an appointment later on -- all three of us had an appointment later with Dr. Sachau.
Q. And when you say all three of us?
A. Terry, Jackson and I.
Q. Okay. And why did you and Jackson have appointments?
A. I think it was a follow up.
Q. For what?
A. Of just a check up, I believe. Mine was on my sugar.
Q. Your sugar did you say?
A. Yes, my diabetes.
Q. Okay. So you had a follow up for diabetes?
A. Yes.
Q. And why was Jackson going, if you know?
A. Just to see if he was over the flu and stuff.
Q. Okay. Well, in fairness, you tell me if I'm wrong, Jackson had basically been symptom free for at least a week, hadn't he, before January 8?
A. Yes. But I just wanted to make sure.
Q. Okay. So you had a specific appointment for Jackson

also?
A Yes
Q. When did you make the appointments for Jackson and you?
A I don't know, probably a week before. I believe, I don't know
Q. Okay. And Terry's appointment, when did you make it?
A He just went with me and Jackson
Q. I see.
A To see if she would look at him for me
Q. So, in other words, you just wanted Dr. Sachau, if she could do it, to work him in?
A Yes
Q. Okay. And do you remember what time your appointment was?
A No, I don't remember.
Q. Do you remember if it was in the morning or afternoon?
A I think -- I think my best knowledge it was in the afternoon
Q. So did Terry get out of bed that morning at all?
A Yes
Q. And what did he do that morning?
A He sat up in the recliner for a while, tried to eat some ice
Q. Did you call the clinic before you went to see if they

could work Terry in?
A. Yes, I did.
Q. And what did they tell you?
A They said for him to come with me and Jackson
Q. When did you make that call?
A Oh, maybe 9 00, 9 30 or so
Q. Okay. And so you guys went to the clinic, you think it was in the afternoon?
A Yes.
Q. And approximately how long did you have to wait once you got to the clinic before you got in to see Dr. Sachau?
A It wasn't very long at all
Q. What does that mean to you?
A Maybe 10, 20 minutes maybe
Q. Now, you told me you took Terry's temperature that morning on the 8th?
A. Yes.
Q. Your husband, did you ever take his temperature again before you went to the clinic?
A. No, I didn't
Q. Did you ever give him Tylenol before you went to the clinic?
A No
Q. Did any medical person ever tell you once your husband

was on the antibiotic you shouldn't give him Tylenol?
A. No
Q. Why didn't you give him Tylenol when he would have a higher temperature once he was on the antibiotic?
A Because I wasn't sure whether to give him or not on top of the antibiotic
Q. Did you ever ask any medical person?
A No That is what I was going to ask Sachau that Wednesday morning -- that Wednesday afternoon.
Q. Okay. Did you ask Dr. Sachau that during that visit?
A I don't know I don't think so but I don't know
Q. Did you ever give your husband Tylenol after the visit with Dr. Sachau and before he went to Pittsburg?
A No
Q. To your knowledge, did anybody give him Tylenol, Ibuprofen, anything after he saw Dr. Sachau and before he went to Pittsburg?
A No.
Q. Okay. Did you actually go in on the visit with your husband for Dr. Sachau, in other words, while she's there seeing him -- well, strike that. Did Dr. Sachau see your husband on the 8th?
A Yes
Q. Did you walk in or accompany her in or accompany your

husband in when Dr. Sachau was actually doing her examination?
A Yes
Q. Did somebody ask your husband what his complaints were, what are his physical complaints?
A I think maybe the nurse did.
Q. And did your husband answer what his physical complaints were, that you heard?
A Yeah. He just said he was bad sick
Q. Did he say anything else?
A No
Q. Do you know the nurse's name?
A No, I don't
Q. Did anybody ask you what his complaints were?
A I just told Dr Sachau that he has a high fever and throwing up, diarrhea, and his stomach and chest hurt, and I told her I had him to the emergency twice this week
Q. Okay. Before we get to Dr. Sachau, did you ever say anything to the nurse?
A No, I don't think so Just that Terry was bad sick and he needed to see Dr Sachau
Q. Okay. From what you remember, whenever the nurse asked your husband what was wrong with him, you were there, and he said bad sick?

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

CLESSA HAWKINS, as Special Administrator for TERRY HAWKINS, deceased, and CLESSA HAWKINS, Individually,

Plaintiff,

-vs-

MERCY KANSAS COMMUNITIES, INC. d/b/a MERCY HOSPITAL FORT SCOTT and MARC ENYARD, MD, ROGER PARRIS, MD., and AMY SACHAU, MD,

Defendants.

Case No. 2:14-CV-02405

D E P O S I T I O N

The deposition of VICKIE CROWE, taken on behalf of the Defendants, pursuant to the Kansas code of Civil Procedure and by agreement before:

Shaun J. Higgins, RMR
Certified Shorthand Reporter
P.O. Box 1596
Pittsburg, KS 66762

a Certified Shorthand Reporter of Kansas, at the Mercy Hospital, Xavier Room, 401 Woodland Hills Boulevard, Fort Scott, Kansas, on the 20th day of January, 2015, at 3:42 p.m.

EXHIBIT 6

Page 46

Q. And I'm trying to speed this up a little bit in that so from January -- this January 7 visit and the January 8 visit to Dr. Sachau, you didn't go to either of those with him; correct?
A. No. I actually had an appointment with Dr. Sachau that day.
Q. What day?
A. The day that Terry had came in.
Q. January 8?
A. Yes.
Q. Let's get to that in a second. When you saw Terry on January 6, did you observe anything different with his condition than what you observed on January 5?
A. I noticed he wasn't getting any better.
Q. So he looked about the same to you, not better, not worse?
A. He looked worse to me.
Q. What do you mean by that?
A. Just his coloring just didn't look good, he wasn't Terry.
Q. Poor color, you observed that?
A. Yes.
Q. Anything else?
A. He always joked with me and he wasn't.
Q. His demeanor seemed different?

Page 47

A. Yes.
Q. Did you observe Clessa at any of this time taking his temperature?
A. No.
Q. Okay. So January 8, you had an appointment with Dr. Sachau?
A. Yes.
Q. Did you know when you went to your appointment that Terry had an appointment?
A. No, sir.
Q. Do you know whether your visit with Dr. Sachau was before or after Terry's?
A. It was after.
Q. How do you know that?
A. Because when I was in the waiting room, Terry had walked out to go to the bathroom, actually I thought Clessa and Jackson was going. And when Terry came out and he went to the bathroom, he said what are you doing, pain in the ass, and I said I got an appointment. And I said what are you doing and he says got checked again. And when he came back out of the bathroom, I noticed that he was kind of dragging one of his feet.
Q. So at that point in time he is back to joking with you?

Page 48

A. Kind of, yes, but it wasn't like he normally would do.
Q. He says what are you doing, pain in the ass, he didn't mean it seriously, did he?
A. No.
Q. It was a joke, isn't it?
A. Yes, it is a joke but --
Q. So he was making conversation with you at least?
A. Well, normally he would come up and he would punch me in my arm or something.
Q. And so did -- he told you he was getting checked again; correct?
A. Yes.
Q. Anything else?
A. That was it. And, well, he did say Clessa and Jackson was in there.
Q. Now, when you said he's dragging his foot, you said you observed that?
A. Yes.
Q. What time is it?
A. It was --
Q. And just relate it to the time of day, morning, afternoon?
A. It was afternoon, I believe.
Q. And can you describe it anymore than that?
A. The day or --

Page 49

Q. No, I'm sorry, the dragging of the foot?
A. He just seemed to be dragging his left foot instead of actually picking it up, it was just like he was kind of scooting it.
Q. This is his left foot?
A. I believe so.
Q. Did you say hey, what are you doing, what's wrong with you?
A. No, I didn't. I figured if he's being checked, you know, he's going to say something or somebody is.
Q. Did you see any of Terry the rest of that day before he goes to Via Christi?
A. No, I didn't.
Q. Did you -- did you go to Via Christi on the 8th?
A. Yes, I did.
Q. And tell me what you remember from going to Via Christi?
A. Burt called and said that Terry had another prescription to get filled and he was going to stop and pick it up. And I guess Dr. Sachau had wrote him a prescription, so he was going to pick it up for Terry and he would be a little bit late coming home. And Burt stopped there to drop it off to him, and he came home, we sat down, we ate dinner, and we get a phone call by Terry, Jr., saying that dad is really

# AFFIDAVIT

STATE OF KANSAS )
) ss
COUNTY OF BOURBON )

I, Christina Keating, being of lawful age and sworn upon oath, do affirm the following:

1. I am the Chief Nursing Officer at Mercy Hospital-Fort Scott, and am familiar with hospital operations.

2. The physicians of Mercy Physicians Clinic see patients in a non-emergent, primary care setting for office visits. Terry Hawkins was seen as a non-emergent, primary care patient by Dr. Amy Sachau on January 8, 2014.

3. While Mercy Physicians Clinic is a physical part of the Mercy Hospital-Fort Scott campus, it bills under a separate Medicare/Medicaid billing number from Mercy Hospital-Fort Scott.

4. Mercy Physicians Clinic does not have a dedicated emergency department, nor does it provide emergency medical services.

5. Terry Hawkins did not present to the Mercy Hospital-Fort Scott emergency department on January 8, 2014.

Christina Keating
Christina Keating

Subscribed and sworn before me this 29th day of Oct., 2015, by:

Marilyn A. Sipe
Notary Public

My commission expires:

NOTARY PUBLIC - State of Kansas
MARILYN A. SIPE
My Appt. Exp. 7-28-19

EXHIBIT
7

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

CLESSA HAWKINS, as Special Administrator For TERRY HAWKINS, deceased, and Clessa Hawkins, individually
Plaintiffs

VERSUS — CASE NO: 2:14-CV-2405

MERCY KANSAS COMMUNITIES, INCORPORATED, D/B/A MERCY HOSPITAL FORT SCOTT, MARC ENYART, M.D., ROGER PARRIS, M.D., AMY SACHAU, M.D., AND SHANNON MEEK
Defendants

* * * * * * * * * * * * * * * * * * * * * * * * * * *

The deposition of Dr. David H. Martin, taken in connection with the captioned cause, pursuant to the following stipulations before Sammantha A. Morgan, Certified Court Reporter, at the offices of Louisiana State University School of Medicine, 1542 Tulane Avenue, Room 332, New Orleans, Louisiana 70112, on the 6th day of October 2015, beginning at 8:50 a.m.

EXHIBIT

8

Page 30

out of the emergency room and have expressed those in the past strongly.
Q. (By Mr. Wray) Are you able to define what an emergency medical condition is as defined by EMTALA? Let me strike that question.
Are you able to resite how EMTALA defines an emergency medical condition?
A. No.
Q. You reviewed the testimony of Dr. Jonathan Kozinn, correct; he's the Saint Luke's critical care physician?
A. Yes.
Q. And Dr. Kozinn developed a diagnosis in his care and treatment of Terry Hawkins of influenza A pneumonia complicated by ARDS. Do you agree with his diagnosis?
A. Yes.
Q. He signed the death certificate as having -- as Mr. Hawkins' death having been caused by influenza A pneumonia. Do you -- do you agree with the cause of death he stated?
A. Yes.
Q. Do you believe that there was any bacterial component to Mr. Hawkins' illness?
A. No.

Page 31

Q. Is it fair to say that because there was no bacterial component to Mr. Hawkins' illness, you wouldn't expect antibiotics to have been effective against his illness?
A. No, you would not have expected antibiotics.
MR. HUDSON: To be effective?
A. To be effective, yes. That's not to say that i fault the doctors for using antibiotics, of course, because empirically that's standard of care in such a situation.
Q. (By Mr. Wray) If -- if we diagnose pneumonia, oftentimes, we will prophylactically use antibiotics to empirically treat potential sources of bacterial --
A. That's a medical --
Q. -- whether they exist or not?
A. There are two terms there that -- you said prophylactics is different from empiric treatment.
Q. I apologize.
A. Yeah. So -- so that your second half of your statement is correct. Empiric treatment of a presumed bacterial infection. So every patient who comes in diagnosed with pneumonia is going to end up on antibiotics because it's often impossible to tell initially whether or not it's a bacterial infection.

Page 32

Q. They're -- they're treated with those antibiotics until the bacterial component is ruled out?
A. Yes, unfortunately they're also continued to be treated with those antibiotics for a longer -- much longer period than they need to be.
Q. Is it true that there's -- in infectious diseases one of the current concerns is the overuse of antibiotics?
A. Yes.
Q. And by that, I mean, that we worry about patients developing resistance to antibiotics because antibiotics were used when there's no identifiable bacterial infection and by increasing the patients' resistance?
A. Overuse of antibiotics in that circumstance is often unavoidable because of the standards that are out there. The main issue comes in with -- with respect to the willingness to stop those antibiotics once it's pretty clear that the patient has another diagnosis.
Q. And in this case, even though it doesn't have any effect on the outcome of it, it tends to be typical practice, it would be fair to say that you -- you saw a time -- a point in time in Mr. Hawkins' case when you thought antibiotics could have and should have been

Page 33

ceased because there were was no identifiable bacterial source?
A. Well, no, that's a difficult -- that -- that's difficult because frequently bacterial we don't -- frequently we don't obtain objective evidence of the bacterial infection and it remains a pru -- remains a presumptive diagnosis of bacterial infection. Objective evidence are positive blood cultures or sputum culture that is positive for a bacteria that is typically associated with pneumonia.
And in those cases, we presume that the patient has a bacterial pneumonia and allow for a 10-day course of antibiotics because we frequently don't actually objectively diagnose the cases. And so in this particular patient, given his circumstances, it was perfectly reasonable to continue with a full course of antibiotics.
Q. Okay. I understand what you're saying. But in this case you feel like in retrospect, at least, when we look back at the totality of the evidence, he has a viral process and we think the antibiotics would not have played a role in his outcome because he didn't have a bacterial source?
A. It turns out that that was the case.
Q. Okay. Is it true that in influenza pneumonia

Page 34

the only available treatment is supportive therapy?
A. No. There are the neuraminidase inhibitors, which are the only drugs that we really have available against these viral infections or against influenza.
Q. Can you list off some of those medications?
A. Well, there's oseltamivir and then there's zan -- zanamivir, which are the two that are available.
Q. Oseltamivir is also known as Tamiflu?
A. Yes.
Q. And Tamiflu is a medication where the literature says it should be administered ideally within the first 48 hours of the onset of illness, correct?
A. The -- ideally, one wants to start -- start it as soon as possible, but that's only ideally.
Q. Is it true that there is no data that suggests that Tamiflu is effective combating influenza after five days from the onset of illness?
A. The evidence is weak in general concerning that. We know that the drug has an effect much longer than two days. What little objective evidence that we have does not substantiate that there is an effect following the five days, that doesn't mean that it doesn't have an effect. It simply means that we have not -- don't have adequate -- we don't have adequate

Page 35

data to be able to tell us that.
Q. Is it true that the clinical trials for Tamiflu showed that it would at best reduce the duration of an influenza illness by one day?
A. The -- in terms of the uncomplicated cases of influenza, in terms of symptoms, it is the -- in terms of the end of symptoms, it's about one day from the end of symptoms, but that doesn't mean that -- the studies that are out there don't really address interim improvement, in terms of feeling better earlier on, beyond the time that all symptoms are gone. So with that, and in my experience the drug has a definite effect early on.
Q. Well, in this case you have a patient who didn't -- didn't seek treatment until 11 days after the onset of illness. You saw that, correct?
A. I'm not sure that it was quite that long, but it was maybe 10 days --
Q. Well --
A. -- something like that.
Q. I mean, I'll tell you that in the medical records and in the testimony of the -- the -- of Mrs. Hawkins, the evidence is that the onset of illness was approximately 11 days prior to the first visit at Mercy on January 5, 2014. So with that background, do

Page 36

you agree that the administration of Tamiflu on January 5, 2014 is unlikely to have changed this patient's outcome?
MR. GULICK: Object to form.
A. Yeah, I don't -- I don't agree with that, no. I think that -- I think that the standard of care in a patient who comes in for -- who has pneumonia during influenza season, particularly when A1N1 is known to be circulating, the standard of care is in addition to antibiotics that they're to be given oseltamivir. And in our hospitals here, uniformly during influenza season, the severe pneumonia is all patients receive oseltamivir. And the -- we have very poor data. We have very little data dealing with these severe cases.
It's the only drug that we have that has any chance of contributing to those patients' good outcome. And the standard is to start the patient on oseltamivir and do a PCR test for the virus. If the PCR test is negative, then the oseltamivir should be stopped because the PCR test is quite sensitive for the virus. And if it's negative, we as infectious disease doctors start strongly advocating to stop the os -- oseltamivir, even though it's a relatively safe drug. They often don't listen to us and they continue treating with the oseltamivir for a long period of

Page 37

time. But the -- the -- if the PCR assay is positive, then these patients are usually continuously treated with oseltamivir until they either completely recover or die, and that's often in a period of three or four weeks.
Q. I want to make sure I understand the -- the totality of what you just said. Is it your opinion that the standard of care requires Tamiflu to be administered to a suspected influenza patient regardless of the onset of illness?
A. Yes.
Q. So whether it's --
A. Or -- or a patient who has severe pneumonia.
Q. Take -- take the severe pneumonia out of the equation for a moment. If it's just a patient who comes in with flu-like symptoms and presents with a possible flu case, is it your testimony that the standard of care requires the administration of Tamiflu whether that illness is one day old or 20 days old?
A. The -- in a case of uncomplicated influenza, the standard of care -- the standard of care would not require treating a patient who presents after, in my opinion, like, 72 hours to be on the safe side. Based on the studies that have been done in patients who have uncomplicated influenza, most physicians are going to,

if they suspect influenza regardless of -- of the time of symptoms, are going to use osel -- oseltamivir in a patient.

So if you have a patient who comes into your office who's been sick for four days, they have sore throat, you do a flu test, and it's positive, 95 percent of physicians in the United States are going to put them on Tamiflu.

Q. And so if --

A. And I -- it's unlikely, we know, from the data that the effect is likely to be minimal for a patient whose had three to four days of symptoms prior to that onset, but nonetheless, that's what -- that's what's done.

Q. If -- if someone testified that Tamiflu is contraindicated after 48 hours --

A. I wouldn't agree with that.

Q. In a complicated influenza patient, do we have any data or evidence that demonstrates that Tamiflu has an effect on the ultimate outcome or the mortality rate for those patients?

A. No good data that clearly proves that. There's some suggestive data that -- that it does, but it's not -- there have been no good research studies that have established that.

Q. Is it such that with -- we use Tamiflu essentially because we don't have anything else we can use?

A. That's right.

Q. It can't hurt, so we're going to try it, we just don't have any data that shows it's really doing anything; fair assessment?

A. Yeah, we assume based on what we know in the -- what we know that the drug is effective -- is effective against the virus that it has, in fact -- and based on my experience with the drug and relatively in sere -- in patients admitted into the hospital, I think that it does -- it does have an effect happening.

Q. Does it prevent mortality?

A. I -- I believe that it does, yes.

Q. What are the situations in which you believe that Tamiflu would prevent mortality? In other words, what's the disease process, length of illness, things like this?

A. Patients with pneumonia.

Q. Is there any data to support that opinion?

A. No.

Q. You referenced before that you believe the Tamiflu should be withdrawn if there is a negative PCR test; is that correct?

A. Yes.

Q. And that so we make our record clear. PCR test is as opposed to a Rapid test, is a confirmation laboratory diagnosis of influenza, correct?

A. It is. It could be used as a diagnostic tool, but it takes too much time to actually get the results back to make it useful.

Q. Did Terry Hawkins have a PCR test?

A. Not to my knowledge.

Q. If Terry Hawkins did have a negative PCR test, would it be your testimony that Tamiflu should have been withdrawn?

A. Yes.

Q. And would it be your testimony that Tamiflu administration would not have had an impact on Terry Hawkins' ultimate outcome if he had a negative PCR?

A. If the negative PCR test had been done early on, the -- the PCR test, again, has no data with respect to duration of shedding the virus, but in general, with respect to PCR tests, PCR tests of course are based on residual DNA that's in the specimen. So after time it -- it will clear. So say, for example, in Terry Hawkins' case, if he had had a PCR test the second week that he was at the Kansas City hospital and it was negative, that wouldn't -- would not make me

think any less that he had the diagnosis.

I would just -- it would be reasonable to assume that the DNA cleared up after a point, but fairly early on -- and so the way the PCR test is used in -- in practice is, when the patient comes into the hospital for the first time, that's the time that the PCR test should be done because we know at that particular point that the sensitivity in the test is 95 percent or so better -- better.

Q. How -- how do we conclude that without factoring in the variable of length of illness prior to the patient seeking treatment?

A. I'm sorry. Could you --

Q. Sure. You said that we think early on in the patient's hospitalization that the PCR sensitivity is highest; is that right?

A. Yes.

Q. So -- but you've talked about before that the test relies on the residual DNA of the virus being present, correct?

A. Yes.

Q. Most patients will recover from influenza in five or six days, correct?

A. Five, six -- the full recovery often takes significantly longer than that, but the first five or

Page 42

six days -- the first -- the first five or six days into the patient's course of PCR test should be positive.

Q. And that's what I'm saying. And so if you have a patient who comes into the hospital, outside of that window -- because Terry Hawkins came in 11 days after the illness starts, does that effect your opinion on whether a PCR would have been valid or had been positive?

A. I think it would have been positive at that point. He was an unusual -- he's one of these patients who has a longer course of illness, so he's sort -- sort of -- sort of on one end of the spectrum of influenza cases in terms of the duration. So therefore the presumption is that he's got an active virus infection that is just progressing more slowly. So I would fully expect his -- I would have fully expected his PCR test to be positive within -- well within a -- a week or so of his hospital admission to Mercy in Kansas City.

Q. Saint Luke's in Kansas City?

A. Saint Luke's in Kansas City, yes.

Q. Okay. That would be almost a month after the onset?

A. Yeah, but this is a guy who's got one of

Page 43

these continuously progressive kinds of infections. So I would assume that his immune system for whatever reason, theoretically, was not combating the virus appropriately. I mean, there's a difference between a patient like this who has this continuous long progressive process developing into a severe pneumonia and a patient who has a severe illness for a couple of days and then slowly begins to get better.

So that's the -- concern of the progression is being sort of -- being the course that looks like this and then down like this and this -- this is a course (indicating) that's kind of gone like this and then has gotten worse and worse in terms of the complications, lung complications.

Q. Just because we have a black and white record and no video, when you were indicating the disease progression, you were indicating that Terry Hawkins' course was a slow upward progression on severity?

A. Yes. Continuous would be more appropriate, I would suppose since he was pretty reasonably sick early on.

Q. And so it sounds like you considered Terry Hawkins to be an unusual patient?

A. Yes.

Q. It would be true that -- that the vast

Page 44

majority of influenza patients will not present as Terry Hawkins presented, correct?

A. Yes, the majority would not.

Q. Are you familiar with the Community-Acquired Pneumonia Hospital Admission Guidelines?

A. I'm familiar with them. I can't quote them to you in detail.

Q. I won't ask you to quote them in detail, I promise you that. But just in general as a concept, you're familiar with those scoring indexes or those guidelines do exist, correct?

A. Yes.

Q. And would it be reasonable for a practitioner to reference those guidelines in making an admission decision for a patient with pneumonia?

A. It would be.

Q. Are you familiar with the class scoring system for patients on the pneumonia severity index guidelines?

A. No.

Q. Would it be fair to say that your -- well, strike that.

Are you familiar with how patients are scored on those guidelines?

A. Well, a variety of factors are used, such as

Page 45

blood pressure, temperature, mental status, oxygenation, blood oxygenation, chest x-rays are similar nonspecifics are probably not used.

Q. Chest x-rays actually are not in the guidelines. Number one, as I suppose because we already presume we have a diagnosis of pneumonia?

A. Yeah.

Q. But number two, like you said, those -- the chest x-rays are nonspecific as to the disease process, correct?

A. It's nonspecific in terms of making an ideologic diagnosis of pneumonia, but it's a critical part of confirming the diagnosis of pneumonia.

Q. Let's say hypothetically Terry Hawkins -- well, no -- strike that.

Do you believe Terry Hawkins had pneumonia as of January 5th, 2014?

A. I think there's a high probability that he did.

Q. On what facts that you found in the record do you base that opinion?

A. His -- well, the -- the -- the facts are that he had -- well, not proven, but clinically I think we all agree that he had H1N1 -- most likely had H1N1 pneumonia and at that point in the progression of that

Page 50

extent on what I picked up from the depositions of his wife and the girlfriend of one of his sons, that I would have thought that he needed to be -- or I think that he would have required admission at that point.

Q. On -- for what purpose?

A. For intravenous antibiotics and oseltamivir.

Q. So we agree though that the administration of antibiotics would not have been --

A. In retrospect, no, but the standard of care in terms of seeing a patient, such as Terry Hawkins in the emergency room, given what he had with a positive chest x-ray, in my view would have required admission into the hospital.

Q. Okay. But you can't say that it's more likely than not the antibiotics would have affected Terry Hawkins' outcome?

A. Well, in fact, we now know that the antibiotics would not have affected his outcome, but at that time the standard of care would have required that he be admitted to the hospital.

Q. I know, but I'm -- follow along with me here for just a second. If we're talking about admitting him to the hospital for specific treatments, I want to discuss which of those treatments would have been -- that you believe would have played a -- a causative

Page 51

role in his outcome, okay? So.

We've -- we've said that he should have been admitted for antibiotics, but we now know in retrospect the antibiotics would not have affected his outcome, correct?

A. Correct.

Q. And you said he should have been admitted for the use of Tamiflu, correct?

A. Yes.

Q. And could he have been administered Tamiflu on an outpatient basis if he had influenza?

A. He could have, but in the presence of a -- pneumonia with a patient who had a duration of the symptoms that he had, he should have been in the hospital to make sure that he was getting the drug.

Q. To make sure that he was receiving the drug?

A. To make sure that he was receiving the drug.

Q. So -- but we have no data to suggest that Tamiflu would have prevented mortality in Terry Hawkins as of that time, correct?

A. I believe that it would have had a substantial -- sub -- substantial effect on his outcome.

Q. And -- and -- but you don't have any data that you can point to that suggests that Tamiflu would

Page 52

have had an effect on his outcome given a 11 days after the onset of illness?

MR. GULICK: Object to form.

A. I think that, again, the evidence is not very solid from the -- not very solid on that point, but it's the only drug -- the only chance he had.

Q. (By Mr. Wray) Okay. Do you believe it's more likely than not that Tamiflu would have prevented Mr. Hawkins from developing ARDS?

A. Yes.

Q. Is that -- that opinion based on your own personal experience?

A. My own personal experience and the practice that -- my colleagues here and what we've done over the years with influenza.

Q. I'm trying to differentiate or to understand in my own mind how it is that you decide without randomized controlled trials or blind studies, which of the patients were just going to get better anyway as opposed to those who got better specifically because they received Tamiflu.

A. Well, it's difficult. So it does come down to a matter of experience and what -- what you're faced with in terms of with individual patients and what you have and what you can offer to those patients. And the

Page 53

consequences if one doesn't intervene and one wants to do what one can.

Q. Is it such that with viral patients as opposed to bacterial patients we are far more limited in the medical treatment we can give those patients?

A. Yes.

Q. And so is the idea that we're going to give Tamiflu and then it could have an effect on the outcome based on the premise that it's better than nothing?

A. Well, it -- it's the only -- it's the only drug that we have that offers any opportunity for the patient to improve over -- im -- improve the natural course of one of these severe infections.

Q. Are -- are patients who are given Tamiflu, do they sometimes have outcomes that result in death despite the drug?

A. Yes.

Q. If you did not give Tamiflu to a viral patient, are you limited to supportive therapy?

A. Yes.

Q. And supportive therapy is what?

A. Ventilation, ventilatory support. The most extreme example of supportive care is the ECMO he received.

Q. And so as of January 5, 2014, Mr. Hawkins did

you'd like.
A. No, I take your word for it.
Q. But I guess what I'm trying to -- to narrow down here, is it your assessment that Terry Hawkins began a more rapid downward decline as he was in the emergency department Via Christi?
A. It sounds as if he did.
Q. And did you read the reason that Mr. Hawkins was admitted at least in the record of Via Christi?
A. I don't recall.
Q. I will read from this record, if you don't mind, I'll read it with you just so we have a clear record on this. It says on Bates stamp Page 020017, also Page 7 of 7 of the emergency room report, "Discussed with Dr. Enyart who would like the patient admitted with pneumonia protocol on triple antibiotic therapy due to failure of outpatient therapy on two medications." Do you see that?
A. Yes.
Q. Do you agree with that assessment that that is the reason to admit Terry Hawkins at that time?
A. Yes.
Q. Is it your opinion that that is medically accurate as the reason for admitting Terry Hawkins?
A. Yes.

Q. Obviously, Mr. Hawkins -- if he had H1N1 influenza and had a -- a fatal outcome, some -- some of those patients do have fatal outcomes, true?
A. Yes.
Q. In spite of the best medical care, you can still have a fatal outcome from H1N1 influenza?
A. Yes.
Q. Do you know what the death rate is?
A. It's about 30, 40 percent.
Q. Mr. Hawkins required more aggressive supportive therapy when he was at Saint Luke's Hospital, true?
A. Yes.
Q. And the more aggressive therapy is ECMO, correct?
A. Yes.
Q. And ECMO is -- well, strike that.
Is ECMO a relatively new treatment?
A. Yes.
Q. When abouts did ECMO start coming into play?
A. Well, the -- over the -- probably goes back to six or seven years was used as cardiac -- part of cardiac recitation and then gradually has been increasing the use for treating ARDS syndrome. And it's kind of rapidly increasing, it was fairly rare

several years ago, but hospitals -- referral hospitals, like, in our community Ochsner Medical Center are increasing the using -- in using it. So in working out of the Ochsner Medical Center I've actually been able to take care of several patients on ECMO.
Q. Is one of the reasons that it is rapidly increasing in its use because the success rates with ECMO are high?
A. Well, I don't know the data that well. In my experience they haven't been very high since the patients that I've taken care of that have been on ECMO didn't survive, but...
Q. Have you had H1N1 influenza patients on ECMO?
A. No.
Q. Did you read Dr. Kozinn's deposition?
A. I did, and I don't remember very many details of it.
Q. Dr. Kozinn testified that Saint Luke's had approximately nine H1N1 patients that were admitted into its ICU for ECMO therapy during the season. Do you recall that testimony?
A. I remember that he had said that he did -- treated some cases. I do not remember the number.
Q. Do you recall that Dr. Kozinn testified that of those patients seven of nine survived their

hospitalization including Terry Hawkins?
A. I don't recall that.
Q. Is that something that you would have made notes on in his deposition?
A. May have. I probably didn't since I don't remember it, so...
Q. There's a reference in Exhibit 5, which are your notes on the notepad to having made notes on Dr. Kozinn's deposition. So my question would be: Do you have that in hard form, hard copy?
A. I'm sorry.
Q. Do you have a hard copy of Dr. Kozinn's deposition anywhere?
A. It's in this -- I think, the second book over here. No, it's not in here. So that's one that's not here.
Q. Can I look at that for just a second?
A. I did not bring that one with me.
Q. Okay. So in your -- in a book that you have that is -- that has a table of contents, it says, "Hawkins Deposition Index," did -- did you create this notebook or was it sent to you in this form?
A. It was sent to me in this form.
Q. So in this notebook there is a deposition of Dennis Fry that we referenced earlier, that you didn't

020017

NAME: HAWKINS,TERRY W
MED REC#: M000215073
PHYSICIAN: BRUEGGEMANN,JOSHUA T MD

Discussed with Dr. Enoch who would like the patient admitted with pneumonia protocol on triple antibiotic therapy due to failure of outpatient therapy on 2 medications. She would also like a CTA of the chest due to the elevated d-dimer. Blood cultures were drawn and the patient was started on the Levaquin in the emergency room.

## Impression

**Impression:**

**Primary Impression:** Pneumonia
**Additional Impressions:** Elevated D-Dimer, Hyponatremia, Hypoxia, Right lower extremity weakness, Sinusitis, Syncope

## Departure

**Decision to Admit/Discharge:** 21:50
**Disposition:** 09 ADMITTED AS INPATIENT
**Condition:** Improved
**Referrals:**
NO,LOCAL PHYSICIAN (PCP/Family)
Primary Care Physician

BRUEGGEMANN,JOSHUA T MD Jan 8, 2014 19:19

PDOC0108-0128

<Created by JOSHUA T BRUEGGEMANN MD>
<Electronically signed by JOSHUA T BRUEGGEMANN MD> 01/08/14 2217

*******************ADDENDUM REPORT*******************

Arial 4Bld
Addendum: BRUEGGEMANN,JOSHUA T MD on 1/8/14 @ 22:40

CTA viewed by me and report reviewed. No evidence of ulnar embolism. Inflammatory response scattered indicative of pneumonitis or pneumonia.

<Created by JOSHUA T BRUEGGEMANN MD 01/08/14 2242
<Electronically signed by

COPY

CC

EXHIBIT
9

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

Case No. 2:14-CV-2405

----------------------------------

CLESSA HAWKINS, as Special Administrator for TERRY HAWKINS, deceased, and CLESSA HAWKINS, individually,

Plaintiff,

v.

MERCY KANSAS COMMUNITIES, INC., D/B/A MERCY HOSPITAL FORT SCOTT, MARC ENYART, M.D., ROGER PARRIS, M.D., AMY SACHAU, M.D., and SHANNON MEEK,
Defendants.

----------------------------------

----------------------------------

DEPOSITION OF:
FRED MUSHKAT, M.D.
OCTOBER 2, 2015

----------------------------------

VERITEXT LEGAL SOLUTIONS
MID-ATLANTIC REGION
1801 Market Street - Suite 1800
Philadelphia, PA 19103

EXHIBIT
10

Page 102

Counselor, don't miss the fact that the standard is cause or contributes to cause the death.

THE WITNESS: Well, my answer is that as an expert in the field of emergency medicine, I've sign an agreement with the American College of Emergency Physicians to not testify outside my area of expertise. And I know when patients need referral for ECMO, but I don't have a clue about how ECMO was given. And to be honest with you, I was surprised that Dr. Kozinn said that some patients remain on ECMO in excess of 50 days. I found that to be profound. I thought it was only something that was done for a few days. So I have no opinion. It's out of my area of expertise.

BY MR. HUDSON:

Q. Okay. So can we agree, then, that you're not going to give an opinion on causation at the time of trial?

A. We can agree on that, at least with regard to his critical situation in February of 2014.

Q. Nor as to the cause of his death? Are you going to give an opinion as to the cause of

Page 103

his death?

A. No. I won't be giving an opinion about cause of death.

Q. Have we covered all of your opinions as to departure of standard of care by Dr. Enyart or Dr. Parris?

A. If you include issues in my report that weren't discussed, particularly EMTALA issues.

Q. I'm not going into EMTALA. Mr. Wray is. I'm asking you standard of care. Standard of care isn't EMTALA, is it?

A. It's not, although following EMTALA is a portion of the standard of care. EMTALA law is a different issue. I'm trying to think of a way to answer your question, the basic question, have I covered all my issues with Dr. Parris. I'm not sure that we have, and rather than let you continue to fish around, maybe I could just state what I think.

Q. Well, let me try and summarize this. As I get the gist what of you're saying is Dr. Parris answered a question, he should have known its answer, would have gone back to the patient and discouraged the patient from

Page 104

signing and registering, whatever you want to call it. Is that the bottom line?

A. Yes, sir.

Q. Okay. With that, have we covered all of your opinions as to Dr. Enyart and Dr. Parris?

A. We did.

Q. Now, you would agree that you don't generally give Tamiflu after 48 hours, correct?

A. I don't. Whether an expert in infectious diseases might in a critical situation in which a patient may be having viral sepsis, that's not something I can answer, but I don't.

Q. Okay. And you saw Dr. Haines in his deposition testified he doesn't give it after 48 hours; in fact, he thought it could even be a departure from the standard of care to give it after 48 hours? Did you see that testimony?

MR. GULICK: Object to form.

THE WITNESS: I read that.

BY MR. HUDSON:

Q. And other than the standard of care of issue, that's your practice as well?

A. It is.

Page 105

MR. HUDSON: Okay. I don't think I have any further questions at this point. Thank you.

THE WITNESS: You're welcome.

EXAMINATION

BY MR. WRAY:

Q. Dr. Mushkat, I represent Mercy Kansas Communities, Inc. and an individual nurse who was sued in the case named Shannon Meek. I'm going to ask you a few follow-up questions. Some of them may dart around. So if you don't understand one of my questions, I want you to tell me and I'll clarify the question.

A. Yes, sir.

Q. What did you specifically do to prepare for today's deposition?

A. I reviewed all of the notes that I made, along with some of the records. I refamiliarized myself with EMTALA law by reading the statute. Having looked at some of the other expert deposition testimonies, I reviewed some definitions that you had asked others that I didn't think were pertinent to my opinions but I reviewed them nevertheless, including acute respiratory distress

Page 150

A. I can't say. And the cultures aren't particularly helpful on a patient who is on multiple antibiotics.

Q. If you're doing a legal review and you're supposed to be declaring things that are more probably true than not true, do you agree that you should have evidence to support your conclusion?

A. You should.

Q. And do you agree that you do not have evidence in this case of a bacterial infection or a bacterial pneumonia at any time for Terry Hawkins?

A. I think you have clinical evidence, but you don't have definitive proof.

Q. Is everyone in this case who concluded that he was unlikely to have bacterial pneumonia, are they just wrong?

A. No.

Q. So you agree with them?

A. I agree that it's possible that he could've had a nonbacterial pneumonia, but we just don't know. And I've tried to be very fair about this both in my report and my deposition today that it's possible that he

Page 151

could've had pneumonia and that I think more likely than not he did. But it's also possible that he might not have had pneumonia or it may have all been viral pneumonia. I just don't know. One of the points that I'm making in here are that the workup wasn't done to make that distinction.

Q. Well, here's what I'm trying to drive at, is what needs to be done? If you think that he is clinically unstable on January 5th, 2014, what needs to be done to make him stable to allow the hospital to comply with EMTALA?

A. He needed to have the lab work that we discussed, the X-ray. And if those were all completely normal and his vital signs stayed normal, he was given IV fluids if there was the issue of the vomiting and diarrhea, and everything were solid, rock solid at that point, then he could've gone home.

Q. But that's not my question. My question is what needs to be done to make him stable?

A. To make him stable would have been to get those tests, find out if he needed intravenous antibiotic therapy at that point, whether he needed admission at that point,

Page 152

and then make a decision about whether he was stable to go home or not.

Q. I guess I just don't understand. You're declaring that he was medically unstable?

A. I believe he was medically unstable on the 5th until proven otherwise.

Q. We have all of the evidence we're ever going to have in this case. Are you saying that he was medically unstable on January 5th, 2014?

A. I believe he was.

Q. And so that's what I'm asking you. What needed to be done, in your estimation, to make him clinically stable?

MR. GULICK: Objection, asked and answered.

THE WITNESS: He needed to have the lab work, he needed to have an X-ray, and based upon the results of those tests, he needed to have medical decision-making to make a decision about how to stabilize him.

BY MR. WRAY:

Q. Well, presumably you believe you know what was going on with Mr. Hawkins on January 5th, 2014 in retrospect, true?

A. In retrospect, I believe he had a bacterial

Page 153

pneumonia that was a complication of a viral infection, most likely influenza.

Q. So the evidence for the bacterial infection is what?

A. Is the fact that he had had a productive cough and fever and this had been going on for 11 days and he was getting worse, all of which would be consistent with bacterial pneumonia and would be considered bacterial pneumonia until proven otherwise.

Q. Those would be consistent with viral pneumonia as well, correct?

A. It could be. That's correct.

Q. And so regardless of which type of pneumonia it is, again, we're talking about clinical stability, because I'm trying to figure out what you'll offer at the time of trial the hospital should have done. Not talking about diagnostic work. Let's assume the diagnostic work is the worst. What does the hospital need to do to stabilize this patient?

A. Assuming that it was a bad case set of labs and X-ray?

Q. Well, we know what we know about Terry Hawkins and his ultimate outcome, and we know

Page 154

what his vital signs were when he showed up to Via Christi and what they became later that night. I'm asking you to use your medical judgment to tell us what is your opinion the hospital needed to do on January 5th, 2014 to stabilize this patient?
A. Well, we have to make assumptions about what the results of those tests are.
Q. Let's assume he's got pneumonia.
A. I suspect that he would've ultimately required admission because this had been going on for 11 days.
Q. And if he is admitted, what's the standard treatment?
A. Intravenous antibiotics, respiratory support, pulmonary toilet, which would mean doing various activities that would help promote sputum production, including adequate hydration, nebulized breathing treatments if necessary, respiratory therapy treatments, whatever needed to be done to improve his respiratory status. All those would be part of the standard.
Q. Now, this is in light, though, of him having a normal oxygen saturation on the 5th?

Page 155

A. Correct.
Q. And so I think we would agree that if he doesn't have a bacterial pneumonia, if he's got a viral pneumonia, the antibiotics are not going to cure him, correct?
A. That's correct.
Q. So if he has a viral pneumonia on January 5, 2014, what does the hospital have to do to stabilize him?
A. I think he would still be hospitalized at that point because this is 11 days into it and he's not a particularly healthy-looking guy to begin with. I think he would be hospitalized and the same things would occur. I think that even if he had a viral pneumonia, I can't imagine an infectious disease expert would not put him on intravenous antibiotics until everything cultured out negative for sure, and at that point they would drop the antibiotics and just do supportive care with him.
Q. Ultimately in this case the cultures did show no bacterial growth, right?
A. But these were all after antibiotics had been delivered for days at a time.

Page 156

Q. But what you just said was that once that happened, the IV expert would withdraw the antibiotics, right?
A. If you have a patient who comes in clean on January 5th and blood cultures are drawn and you get sputum cultures and possibly even bronchoscopy and all of that comes back negative and he's on multiple intravenous antibiotics, I think at that point that it's my understanding that that's what an infectious disease expert would do.
However, I do not hold myself out as an infectious disease expert, nor do I practice in-hospital medicine.
Q. So assuming again it's a viral pneumonia -- which you understand that's what Dr. Kozinn attested to, right?
A. I agree.
Q. And so let's assume he's got the viral pneumonia. I think you mentioned he would receive supportive care; is that right?
A. A lot of this would be supportive, or what's called pulmonary toilet, everything that can be done to improve the respiratory status of the patient.

Page 157

Q. And the reason we call it supportive care is because we actually don't have a cure for viral pneumonia, true?
A. That's true. There is no specific drug that can be administered to reverse his viral pneumonia, if that were the case.
Q. And is it true that even in the face of supportive care, viral pneumonia patients can and do die?
A. That's correct.
Q. And have you ever seen the pneumonia scoring guidelines?
A. I have.
Q. Do you think it's fair for a reasonable and prudent practitioner to use those guidelines to guide decision-making?
A. I think it's reasonable to do. I don't believe it's below standard of care to do, but I think that most physicians use clinical judgment over that, and I think that there have been studies on that and the studies show that an experienced emergency physician -- I can't talk about other specialties -- an experienced emergency physician using good clinical judgment does a

Page 158

better job than using the scoring scales with regard to the pneumonia severity index.
Q. Well, those indices are created by data, correct; they're data driven?
A. Yes, they are.
Q. So these are studies that physicians or groups or practitioners have done over time to give predictive value to the mortality of pneumonia patients, correct?
A. That's correct. It's just not something that's used in emergency medicine, though.
Q. They're not used at all?
A. I'm sure that some people use it, but we don't really make decisions about prognosis. If someone needs to be admitted, we admit them. If they don't need to be admitted, we send them home. And you certainly wouldn't want to send somebody home with a severe pneumonia severity index. So if you want to use it as a guide for whether to send a patient or home or not, if they fall into a dangerous range in that index, it would be fool-hearted to send them home.
Q. Well, that's what I'm getting at. You use the data that comprises the guidelines, in

Page 159

other words, the historical knowledge here to decide which patients need to be admitted and which don't, right?
A. Well, what I said before is that when you say you, if you refer to me in particular, or most of the emergency physicians that I know, they use their clinical judgment rather than these indices because the indices are not always as good a decision-making evaluation as clinical judgment.
Q. Do you think that it's inappropriate that the guidelines themselves appear in ER textbooks?
A. No.
Q. Do you think that a reasonable practitioner could use those as a guide for decision-making?
A. Yes.
Q. Do you agree that in this case Terry Hawkins on January 5th, January 7th and January 8th scored class 1 or class 2 if he was in fact a pneumonia patient?
A. I would have to look at the guideline -- look at the pneumonia severity index again and confirm that, but I believe that you're right.

Page 160

Q. Well, and what I'm getting at here is -- and I'm not going to hold you to numbers or anything like that in terms of class 1 or class 2. He would have been considered on the scale of pneumonia severity an outpatient at all times until he decompensated at Via Christi on the 8th, true?
A. Well, if you followed the severity index in and of itself, yes, but I believe the clinical judgment would have made this patient an inpatient.
Q. And that's what I'm getting at. It's your opinion that the providers in this case should have, for lack of a better term, ignored the scoring guidelines and admitted him in spite of them, true?
A. I think that in this situation, yes.
Q. And would you agree with me that a patient who scores class 1 on the pneumonia severity index guidelines has a 99.4 percent chance that he or she will not have a mortality event?
A. I haven't memorized those numbers, but it wouldn't surprise me.
Q. Somewhere in that range? I mean, it doesn't

Page 161

have to be 99.4. I'm just telling you that's what they say. But somewhere well in excess of 95 percent of those patients are going to live, right?
A. Correct.
Q. And so what we talk about with the pneumonia severity index is the class 4 or class 5 patients, those patients with a clear severe case of pneumonia are hospital admission, correct?
A. Yes. And the point I'm trying to make is if you're a class 4 or a class 5 on a pneumonia severity index, you don't need that index to tell you that that patient needs to be admitted. They're very, very sick and it's easy to tell.
Q. And the charts from -- I just want to make sure I've got agreement on this point before we leave it. The charting from January 5, 2014 all the way through the initial two sets of vital signs taken on January 8 at Via Christi all would place Terry Hawkins as an outpatient, true?
A. If you used just the severity index, that's correct.

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

CLESSA HAWKINS, as Special *
Administrator for TERRY HAWKINS, *
deceased, et al., *
Plaintiff, *
*
*
vs. * CASE NUMBER:
* 2:14-CV-2405
*
MERCY KANSAS COMMUNITIES, INC., *
D/B/A MERCY HOSPITAL FORT SCOTT, *
et al., *
Defendants. *

* * * * * * * * * * * * * * * * * * * * * * * * * *

DEPOSITION OF: CHRISTIAN A. MERLO, M.D.

TUESDAY, OCTOBER 20, 2015

EXHIBIT 11

MR. HUDSON: By the way, ECMO is E-C-M-O.

BY MR. HUDSON:

**Q. So actually the discharge summary at Via Christi by Dr. Herder (phonetic) showed the diagnosis was influenza developing into ARDS, wasn't it, as opposed to pneumonia developing into ARDS?**

A. That's the same thing. I mean influenza, pneumonia, suspected influenza. I don't think we have a very clear-cut pathogen reason for his pneumonia and ARDS which is unfortunately all too common in our practice.

**Q. Then we have already covered on page 4 at the top you talked about the 96 percent pulse ox being abnormal. And you say had he been treated with intravenous antibiotics for pneumonia more likely than not his condition would not have progressed to acute respiratory failure, correct?**

A. That's correct.

**Q. Tell me all your basis for your opinion**

**there was a bacterial infection present.**

A. Well, I think in terms of pneumonia the most common cause of community-acquired pneumonia, which is what was suspected, is a bacterial pathogen. I know that a virus was suspected as well. Given the time course, he could have had a viral infection, even though the tests were negative, but oftentimes we see secondary bacterial infections. And because he was on antibiotics already oftentimes we don't get cultures that are positive.

He did have one culture positive in a bronchoscopy that grew stenotrophomonas which is not a very common community pathogen, but he had already been in the hospital already. So it's hard to say that that was the pathogen. But most times we don't have a pathogen, even when patients have bacterial pneumonia, and that's just the way it is in medicine. So there's -- given my experience and training and in taking care of patients this is very consistent with

community-acquired bacterial pneumonia.

**Q. Okay. So let me see if I understand you. So your basis that this was bacterial pneumonia, if we label them one, two, three what are they? What's the first basis this is bacterial pneumonia?**

A. The severity of it.

**Q. The severity. What about the severity made this bacterial pneumonia?**

A. Well, he rapidly required mechanical ventilation and went into ARDS. And pneumonia, bacterial pneumonia is one of the most common causes of acute respiratory distress syndrome.

**Q. Viral pneumonia couldn't do that?**

A. It can. It can do that.

**Q. So would viral not be as likely as bacterial in leading to the development of ARDS?**

A. Viral pneumonia is much less common than bacterial pneumonia. And, in fact, many times bacterial pneumonia follows viral pneumonia. And this clinical situation is a very, very, very

common scenario for a patient to have bacterial pneumonia even though we have negative cultures.

**Q. Does the CAT scan support viral pneumonia as opposed to bacterial pneumonia?**

A. The CAT scan could support either. There are ground glass infiltrates as described in the report. That can -- there's no way you can make a diagnosis from a CAT scan. That could be viral. It could be atypical bacterial pneumonia. It could be progressing classic typical bacterial pneumonia. And there's no way that anyone could say that a CAT scan is a definite diagnosis of viral or bacterial.

**Q. Okay. So you are saying the ground glass appearance in the CAT scan supports both viral and bacterial, not one over the other in medical literature; is that correct?**

A. Ground glass infiltrates have been described in viral pneumonia, yes.

**Q. More so than bacterial?**

A. I don't think anyone can say that,

Page 102

because ground glass infiltrates are described in atypical bacterial pneumonia as well.

**Q. So, number 1, you said the severity supports this was bacterial, although you acknowledge that viral could be just as severe, correct?**

A. Viral could be just as severe.

**Q. Okay. What else supports this was bacterial versus viral pneumonia?**

A. The progression of it.

**Q. What about the progression?**

A. That there's a rapid progression to respiratory failure and development of ARDS.

**Q. And is it your testimony that viral couldn't cause this same rapid progression?**

A. I didn't say it couldn't cause it. I said that it's less likely because bacterial pneumonia is more common.

**Q. What else supports your opinion this was bacterial pneumonia as opposed to viral pneumonia?**

A. I would have to say the progression of

Page 103

it all.

**Q. You said that.**

A. Well, I said severity.

**Q. And you said progression.**

A. So maybe progression is not the right word, but the whole time course from the start of symptoms to what led to his respiratory failure and his symptoms during that time course, fever, shortness of breath, eventual respiratory failure, mucus in the airways as seen by bronchoscopy. You know, those suggest a bacterial process.

**Q. Can those also be present with a viral process?**

A. Again, they can, but viral processes causing this are much, much less common.

**Q. So if it were a viral process causing this that is much less common, would it be more likely for an ER doc or a family physician to miss it if it's viral if it's less common?**

A. Not necessarily, not if a proper evaluation was performed, not if a chest x-ray was

Page 104

done, not if a pulse oximetry was done in the office, and not if prompt, prompter care was performed.

**Q. Now you made the comment the progression, the start to what led to the respiratory failure and the symptoms. Actually the respiratory failure didn't occur until what, 13, 14, 15 days out from the onset of symptoms?**

A. That's correct.

**Q. So is that a rapid progression?**

A. Well, it can be because the symptoms started in early January and that may well have been a viral process. And oftentimes a week or two, seven, ten days, 14 days into a viral process it can be five days. But some period of time into a viral process oftentimes patients develop a bacterial process which then can be fairly rapid. And in review of the medical records that type of rapidity in the setting of a potential viral process in the beginning, that type of rapidity more likely is associated with a bacterial

Page 105

process.

**Q. What are all the things that tend to rule against a bacterial pneumonia in this case that were objective findings in this case?**

A. I don't think anything rules in or rules out. Bacterial pneumonia is incredibly common.

**Q. So the fact there's a negative blood culture in your opinion has nothing at all to do with ruling out a bacterial pneumonia, correct?**

A. Correct.

**Q. A negative sputum culture has nothing to whatsoever to rule out a bacterial pneumonia in this case in your opinion, correct?**

A. Correct.

MR. WRAY: Could we take another quick break?

(Whereupon, there was a brief recess, 9:50 a.m. - 9:52 a.m.)

BY MR. HUDSON:

**Q. I want to go back to the bottom of page 4 where you talk about at this time given his**

Page 122

**testified that antibiotics were appropriate to be provided to Mr. Hawkins for empirical coverage, but because there was no bacterial infection present it would have been of no benefit. Do you agree with that opinion?**

MR. GULICK: Object to form.

MR. HUDSON: What's wrong with that question? It's his testimony specifically, so what's wrong with the question? What's the form of it that's wrong?

MR. GULICK: Because you are asking one expert to comment upon the veracity of another.

MR. HUDSON: No. I asked him to assume he said that, does he agree.

MR. GULICK: No, no. That's not the same thing as asking him to comment upon the opinions of another expert.

BY MR. HUDSON:

**Q. Okay. Do you understand the question, Doctor?„**

Page 123

A. Perhaps you could repeat it.

**Q. Yeah. I want you to assume Dr. Martin, plaintiff's retained infectious disease expert, has testified antibiotics were appropriate to be provided to Mr. Hawkins for empirical coverage, but because no bacterial infection was present they would have been of no benefit. Do you agree?**

MR. GULICK: Object to form.

THE WITNESS: There are actually a couple of questions in there. Can you break that down a little bit for me?

MR. WRAY: All right. Let's simplify this by you have a running objection that these questions are calling for comment on credibility. I would say these are opinions, not facts or truthfulness. But we will have that argument later. We will have it on paper and it will have been preserved. And then you can answer the question without interruption.

MR. GULICK: And do you agree, sir?

Page 124

MR. HUDSON: Sure.

BY MR. HUDSON:

**Q. Let me ask the question this way. If there was no bacterial infection present you would agree antibiotics would be of no benefit, correct?**

A. That's correct.

**Q. In your report we can agree you nowhere talk about oseltamivir or Tamiflu being administered to the patient as part of standard of care, correct?**

A. That's correct.

**Q. Now you talk about on page 5 -- well, let me back up just a minute. On page 4 you make the comment -- at the top of the page you talk about the elevated fever and so on. And you go on to say had he been given intravenous antibiotics for pneumonia on January 5 more likely than not his condition would not have progressed to acute respiratory failure. Do you see that?**

A. Yes.

**Q. We can agree that if in fact he didn't**

Page 125

**have bacterial infection and you gave IV antibiotics it would be of no benefit to him, correct?**

A. If he did not have bacterial infection, --

**Q. Correct?**

A. -- correct.

**Q. And the same thing with January 7, you again say if you treat him with IV antibiotics for pneumonia that it would not, more likely than not his condition would not have progressed to acute respiratory failure. Again, if he did not have bacterial pneumonia the giving of IV antibiotics would not have prevented his condition from progressing on to acute respiratory failure, correct?**

A. So it depends because IV antibiotics are usually given in the hospital. And there's more supportive care performed in the hospital than there is an outpatient setting. So it's hard to divide the two up. If we are talking about IV

Page 186

**fact, have a bacterial superinfection, correct?**
A. That he did or didn't?
**Q. Did.**
A. Yes.
**Q. So time does matter. And so we need to figure out how long he's really been sick, right?**
A. Yes and no, because the viral process, if that was seven days before or two weeks before, I'm not sure it really matters. But where did his clinical status change?
**Q. Well, let me just do it this way. If the Via Christi record was right and what was reported to them was a four-day course of illness, then you agree with me that is not a bacterial superinfection, true? It's just simply not been in existence for enough time to be a bacterial superinfection.**
A. But if Via Christi -- he's in Via Christi on the 8th.
**Q. Right.**
A. And he's -- he was seen at Fort Scott on

Page 187

the 5th. So that's three days before. And on the 5th it's documented that he had at least a week of symptoms before that. So I mean I think we are getting confused by several different hospital systems documenting different things.
**Q. I don't think it's that confusing. At Mercy he reported 11 days. At Via Christi it was reported cough, cold for several days and fever since Sunday which would have been about four days. You understand that that discrepancy exists, right?**
A. That's correct.
**Q. And so if, in fact, what they reported to Via Christi was correct that can't be a bacterial superinfection pneumonia, true?**
A. No.
**Q. Have you ever seen a patient with an influenza course followed by a bacterial superinfection that happened within four days?**
A. Yeah. I mean I can recall one patient who had influenza, who then had bacterial

Page 188

pneumonia and needed a lung transplant and that was pretty quick.
**Q. How many days?**
A. A few. I mean I don't think that it's very easily generalizable in talking about how quickly bacterial infection occurs in the setting of a suspected viral infection.
**Q. So would it be your opinion that if he had bacterial pneumonia that he more likely than not had that on the 5th, bacterial pneumonia?**
A. I think that he was at a very high risk of developing bacterial pneumonia on the 5th. Was it present? It could have been developing. But I don't think I can say more likely than not whether or not he had -- I think he was certainly at risk for developing bacterial pneumonia on the 5th .
**Q. I understand that. But what we need to do before we leave here today is know which opinions you hold to a reasonable degree of certainty. Okay? So do you hold the opinion to a reasonable degree of certainty that on January 5,**

Page 189

**2014, that Terry Hawkins had a bacterial pneumonia?**
A. We don't have a chest x-ray, so we don't know what that looked like.
**Q. But I'm asking you in retrospect. You have the benefit of hindsight. I'm asking you. And if don't hold that opinion, that's fine. But I just need to know whether you do or don't.**
A. I think he was at risk, but it's not clear that he had bacterial pneumonia on the 5th.
**Q. Right. What I want to know is what are you going to come to trial and say to a reasonable degree of medical certainty? Are you going say that on January 5, 2014, to a reasonable degree of medical certainty Terry Hawkins had in progress a bacterial pneumonia?**
A. I don't think that that's what was going on January 5th.
**Q. So had antibiotics been administered on January 5th -- strike that. What do you think was the cause of Mr. Hawkins signs and symptoms on**

**fact, have a bacterial superinfection, correct?**

A. That he did or didn't?

**Q. Did.**

A. Yes.

**Q. So time does matter. And so we need to figure out how long he's really been sick, right?**

A. Yes and no, because the viral process, if that was seven days before or two weeks before, I'm not sure it really matters. But where did his clinical status change?

**Q. Well, let me just do it this way. If the Via Christi record was right and what was reported to them was a four-day course of illness, then you agree with me that is not a bacterial superinfection, true? It's just simply not been in existence for enough time to be a bacterial superinfection.**

A. But if Via Christi -- he's in Via Christi on the 8th.

**Q. Right.**

A. And he's -- he was seen at Fort Scott on

the 5th. So that's three days before. And on the 5th it's documented that he had at least a week of symptoms before that. So I mean I think we are getting confused by several different hospital systems documenting different things.

**Q. I don't think it's that confusing. At Mercy he reported 11 days. At Via Christi it was reported cough, cold for several days and fever since Sunday which would have been about four days. You understand that that discrepancy exists, right?**

A. That's correct.

**Q. And so if, in fact, what they reported to Via Christi was correct that can't be a bacterial superinfection pneumonia, true?**

A. No.

**Q. Have you ever seen a patient with an influenza course followed by a bacterial superinfection that happened within four days?**

A. Yeah. I mean I can recall one patient who had influenza, who then had bacterial

pneumonia and needed a lung transplant and that was pretty quick.

**Q. How many days?**

A. A few. I mean I don't think that it's very easily generalizable in talking about how quickly bacterial infection occurs in the setting of a suspected viral infection.

**Q. So would it be your opinion that if he had bacterial pneumonia that he more likely than not had that on the 5th, bacterial pneumonia?**

A. I think that he was at a very high risk of developing bacterial pneumonia on the 5th. Was it present? It could have been developing. But I don't think I can say more likely than not whether or not he had -- I think he was certainly at risk for developing bacterial pneumonia on the 5th .

**Q. I understand that. But what we need to do before we leave here today is know which opinions you hold to a reasonable degree of certainty. Okay? So do you hold the opinion to a reasonable degree of certainty that on January 5,**

**2014, that Terry Hawkins had a bacterial pneumonia?**

A. We don't have a chest x-ray, so we don't know what that looked like.

**Q. But I'm asking you in retrospect. You have the benefit of hindsight. I'm asking you. And if don't hold that opinion, that's fine. But I just need to know whether you do or don't.**

A. I think he was at risk, but it's not clear that he had bacterial pneumonia on the 5th.

**Q. Right. What I want to know is what are you going to come to trial and say to a reasonable degree of medical certainty? Are you going say that on January 5, 2014, to a reasonable degree of medical certainty Terry Hawkins had in progress a bacterial pneumonia?**

A. I don't think that that's what was going on January 5th.

**Q. So had antibiotics been administered on January 5th -- strike that. What do you think was the cause of Mr. Hawkins signs and symptoms on**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

---

CLESSA HAWKINS, as Special Administrator for TERRY HAWKINS, deceased, and CLESSA HAWKINS, individually,

Plaintiff,

-vs- Case No. 2:14-CV-2405

MERCY KANSAS COMMUNITIES, INC., d/b/a MERCY HOSPITAL FORT SCOTT, MARC ENYART, M.D., ROGER PARRIS, M.D., AMY SACHAU, M.D., and SHANNON MEEK,

Defendants.

---

Examination of J. RICHARD LUDGIN, M.D., taken at the instance of the Defendants, under and pursuant to all applicable rules, before JANE M. JONES, a Certified Realtime Reporter, Registered Merit Reporter and Notary Public in and for the State of Wisconsin, at Corneille Law Group, 615 South Monroe Avenue, Green Bay, Wisconsin, on September 28, 2015, commencing at 8:41 a.m. and concluding at 11:07 a.m.

EXHIBIT 12

two, but that's pretty close.
Q Did you read, in full, the deposition of Barbara Johnson?
A I did.
Q She was the registration clerk on January 5th?
A Yes.
Q Have you read in full the deposition of Marilyn Brown? She was the registration clerk on January 7th.
A Yes, with pleasure, because you guys were short.
Q Did you read, in full, the deposition of Christi Keating?
A I did.
Q Did you receive exhibits from Christi Keating's deposition?
A I don't know if I received them or not. I have the deposition.
Q Is there something you can look at to tell you whether you received them?
A Not as I'm sitting here.
Q Did you bring all of the materials that you reviewed today?
A I have, I'm pretty sure, everything that she reviewed, that she referred to. I have the two physician agreements. We talked about those. We

talked about these procedures -- these policies, rather.
Q Anything else? I'll tell you, there was an Exhibit 36.
A Okay.
Q That was a spreadsheet that was fairly extensive.
A The one where you talked about insured and not insured patients who -- I did not review that, but I read the deposition. I saw the percentage for insured and uninsured. I remember that fairly well. I think it was 302 patients with insurance, 155 or -56 had -- insured people had chest x-rays, and then -- whatever it was, it left about 26 uninsured patients of whom 11 or 12, I think, did have chest x-rays. At least, I think that's what I remember from the deposition.
Q Is there some reason you didn't get the actual exhibit, that you know of?
A I read it -- is there any reason why I didn't get it?
Q Yes.
A Not particularly. I assume the numbers that are in the deposition are accurate. Why would I go back and redo that work?
Q I'm trying to ask you this. Was it your conclusion

that there was no correlation between whether a patient had insurance, as to whether they got an x-ray?
A The issue I'm testifying, is whether or not this patient who didn't have insurance didn't get an x-ray. Not whether or not there is a grand plan and a scheme at Mercy Fort Scott Hospital to deprive the uninsured of medical care.
Q All right.
A I'm not here to testify that the hospital has a plan to violate the law, just whether it was violated in this instance.
Q Okay, and that's what I want to understand. Your opinions today are whether or not Terry Hawkins' specific encounter, let's say, on January 5th, involved an adequate medical screening examination from a medical standpoint, right?
A That's correct. I want to go back and just add something about the spreadsheet. The other reason I didn't go back is because Ms. Keating also talked about the fact that when they had a chest x-ray on there, it could have been done anytime during the patient's admission. It wasn't just the ED, and she couldn't separate out chest x-rays from CT scan, so I understand why it was presented, but I

know that if I looked at the spreadsheet, I wasn't going to have any more reliable information on the global question than you had at the time.
Q It will shorten this a little bit, just so I can kind of distill this down into the major opinions here, if I understand the scope of the review or what your goal was.
A Um-hum.
Q So if I understood your prior testimony correctly, you made a determination here, in your opinion, about whether EMTALA was violated on January 5th regarding the sufficiency of Mr. Hawkins' specific screening examination versus, in the broader context, whether that was similar to that which other patients get or whether there was any difference between insured patients and uninsured patients, true?
A Yeah, that's correct.
Q So you looked at the statute for EMTALA before you came to today's deposition, correct?
A I did.
Q Can you tell me what specifically you looked at to find the statute? There are multiple legal sources you can look at to find the statute. I'm just curious as to which one you looked at.